Ryan J. Regula (#028037)
Charlene A. Warner (#037169)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
rregula@swlaw.com
cwarner@swlaw.com

Camille P. Varone (*pro hac vice forthcoming*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue, N.W., Suite 1410
Washington, D.C. 20004
Telephone: 202.921.4105
cvarone@firstliberty.org

David J. Hacker (*pro hac vice forthcoming*)
Jeremiah G. Dys (*pro hac vice forthcoming*)
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: 972.941.4444
dhacker@firstliberty.org
jdys@firstliberty.org

Steven D. Keist (#11251)
KEIST THURSTON O'BRIEN
10150 W. Desert River Blvd.
Glendale, Arizona 85037
Telephone: (623) 937-8888
steve@ktolawfirm.com

*Attorneys for Plaintiff Gethsemani Baptist Church*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gethsemani Baptist Church, an Arizona nonprofit corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>City of San Luis, a political subdivision of the State of Arizona; Nieves G. Riedel, in her individual capacity; Jenny Torres, in her individual capacity; and Alexis Gomez Cordova, in his individual capacity,<br><br>　　　　　Defendants. | No. 2:24-cv-00534-ESW<br><br>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>(Oral Argument Requested) |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Gethsemani Baptist Church moves this Court for a preliminary injunction against Defendants City of San Luis (the "City"), Nieves G. Riedel, Jenny Torres, and Alexis Gomez Cordova (collectively, "Defendants") from taking any enforcement action against the Church for operating its Food Ministry or lawfully loading and unloading semi-trucks on its property. This request is based on this Motion, the accompanying Memorandum of Points and Authorities, the Verified Complaint and its exhibits, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

Gethsemani Baptist Church (the "Church") is a small church located only a couple blocks from the border in the city of San Luis, Arizona. For nearly twenty-five years, the Church has operated a food ministry to support some of the most vulnerable families in the southernmost part of Yuma County and across the border in Mexico. The Church's ministry efforts have filled a critical need in the City by donating food and other household supplies to anyone in need, thereby providing the Church a unique opportunity to share the Gospel and live out Jesus' teachings in Matthew 25:35–40: "For I was hungry, and you fed me. I was thirsty, and you gave me a drink. I was a stranger, and you invited me into your home. I was naked, and you gave me clothing. I was sick, and you cared for me. I was in prison, and you visited me."[1]

For many years, the City celebrated the ministry, often issuing monetary grants and even participating in the Church's food drives. However, the recent election of a new mayor heralded a major shift in the City's approach. Although the Church had operated the ministry in the same manner for decades without complaint, the City suddenly turned hostile, bombarding the Church with a series of accusations that its ministry and semi-trucks

---

[1] Similar teachings appear throughout Scripture: "It is a sin to despise one's neighbor, but blessed is the one who is kind to the needy . . . whoever is kind to the needy honors God." *Proverbs* 14:21, 31 (New Int'l Version). "He upholds the cause of the oppressed and gives food to the hungry." *Psalm* 146:7 (NIV). "Suppose there is a righteous man who does what is just and right . . . He does not commit robbery but gives his food to the hungry and provides clothing for the naked." *Ezekiel* 18:5, 7 (NIV).

- 1 -

violate the City's Zoning Code, and threatening to take enforcement action.

Although the Church has repeatedly explained that its operations are lawful, Defendants have refused to discuss any solution that would allow the ministry to continue—even resorting to citing the Church's pastor for passing out food to just a few hungry people. Yet, despite this relentless persecution, the City routinely turns a blind eye to commercial vehicles regularly parking and unloading at nonreligious properties in the same or similar zones. As the Church and its pastor cannot afford the expensive fines, and any future citations risk escalating criminal penalties, the Church reluctantly paused its Food Ministry.

The Church simply wishes to follow Jesus' command to feed the hungry in peace. Nevertheless, the City and its named officials have inflicted a heavy toll on the Church in violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq*. ("RLUIPA"), the U.S. Constitution, and Arizona's Free Exercise of Religion Act, A.R.S. § 41-1493, *et seq*. ("FERA"). Accordingly, the Church respectfully requests that this Court preliminarily enjoin Defendants from taking any enforcement action against the Church to ensure that the Church's rights remain protected until resolution is made.

## SUMMARY OF FACTS[2]

For nearly twenty-five years, the Church has conducted a Food Ministry on its property as an expression of its religious beliefs to provide for the San Luis community and nearby areas. In addition to weekly services, the Church has distributed hundreds of thousands of pounds of free food to the poor, to other churches, and even to communities across the border in Mexico—historically serving up to 300 needy families every week. The Church is able to run the ministry through donations of food and operational funding by other churches and organizations throughout the southwestern United States.

The Church's standard practice for running the Food Ministry has remained consistent since 2002. Typically, the Church would use semi-trucks to transport food from a City-owned warehouse to the Church's parking lot, unload and distribute food from the

---

[2] The facts of this case are stated in Plaintiff's Verified Complaint, which is incorporated herein by reference.

sanctuary, and then return anything remaining to the warehouse. Although located in a residential zone, the City's operative Zoning Code treated the Church as a "legal nonconforming use," which expressly allowed the Church to operate the Food Ministry without a Conditional Use Permit ("CUP"). At no point until recently did the City ever complain about the Church's operations, nor issue any citations for health, safety, or other zoning code violations. And for most of the Church's history, the City has not only been aware of the Church's efforts, but also warmly supported the Food Ministry through financial grants and promotional activities.

Despite the City's historic support for its only viable food ministry, this uninterrupted state of affairs suddenly changed upon the election of Mayor Nieves Riedel in late 2022. Soon after taking office, the Mayor initiated an unprovoked crusade against the Church, first by revoking its permission to use the warehouse and public park adjoining the Church for ministry activities and then by unsuccessfully attempting to veto a $7,000 grant allocation. Although the Mayor's veto was eventually overridden by the City Council, she still imposed several conditions upon the Church's receipt of funds—and to this day, the Church has still not received the promised funding.

But the Mayor's vendetta against the Church did not stop there. At her direction, the other Defendants began to send escalating cease-and-desist notices against the Church, making their intent to shut down the Food Ministry increasingly apparent. During the first wave, the Church was abruptly informed that the City Code categorically prohibited semi-trucks from loading and unloading in residential areas.[3] (*See* Doc. 1 at Ex. A; *see also id.* Exs. B–D, F & H.) This enforcement threat came as a surprise to the Church, as it did not use the street to park the semi-truck. And to the extent it used its own parking lot, the Church

---

[3] Defendants' notices point to various Code provisions that prohibit (1) parking a vehicle on a "paved or main traveled part of the roadway" in a residential district when it is practicable to park off the roadway, SLCC § 10.15.245; (2) parking a semitrailer or similar vehicle on a local street of a residential area except during loading or unloading, § 10.15.250; and (3) parking any commercial vehicle of more than a particular weight on a residential or commercial area for "a period of more than two hours," § 10.15.255. (Doc. 1 ¶¶ 48–49, Ex. A.)

- 3 -

agreed to keep its unloading efforts to under two hours. Nevertheless, to avoid enforcement in the short term, the Church started using a smaller truck to ferry supplies, which immediately plummeted the number of needy people the Church could assist.

But that was not enough. Only a couple weeks later, the City Code Enforcer sent a notice of violation that the *ministry itself* violated City Code and had been deemed a commercial activity, thus necessitating that the Church cease all food storage or distribution on its property. (*Id.* Ex. C.) Although the Church clarified on multiple occasions (1) that the Food Ministry was a charitable religious effort, not a commercial business, (2) that Defendants' accusations are inconsistent with the Code's requirements, and (3) that Defendants' attempt to shut down the ministry violate the Church's constitutional and statutory rights (*id.* Exs. B, E & G), Defendants doubled down on their demand that the Church relocate its operations to a commercial zone (*see id.* Ex. D), or else obtain a CUP to continue the Food Ministry (*see id.* Ex. F). They also reiterated their accusation that the Church routinely violated unspecified "traffic and motor vehicle laws" by parking the semi-truck on its property. (*Id.* Ex. H.) Notably, however, Defendants have not responded to 18-wheeler semi-trucks and other commercial vehicles that regularly park, unload, and load in the same residential zone in front of both residences and commercial businesses, including the nearby Head Start program.

Because of Defendants' cumulative threats, the Church dramatically reduced the scale of the ministry. However, the war against the Church still did not abate. In late February 2024, when the Church's pastor was handing out small quantities of emergency food supplies to a group of about ten people, the Code Enforcer arrived unannounced and issued four citations for (1) unspecified "[u]se of property . . . not permitted in" a residential zone, and (2) "construction" of structures that had been built nearly thirty years ago "without a building permit." (*Id.* Ex. I.) Then, less than a week later, a donation truck mistakenly drove to the Church instead of an off-site location. Although the truck left within five minutes, the Code Enforcer showed up again, this time with police, to issue four identical citations because the third-party truck had parked temporarily in front of the

1  Church. (*Id.* Ex. J.) Together, these citations may result in thousands of dollars in penalties, and any additional citation could result in a Class 1 Misdemeanor, heavy fines, and jail time.

As these incidents show, Defendants are now attempting to extract civil and potentially criminal penalties against the Church's pastor for feeding the hungry and having structures on its property that have been in plain sight for decades. That he was cited the second time, for a third-party's mistake, shows an increasing pattern of intimidation against the Church to stop its ministry efforts. Moreover, the pastor recently heard City workers say that the Church needs to understand that the Food Ministry will be shut down completely.

Because Church cannot afford to apply for a CUP or to pay the fines against its pastor, it eventually paused its Food Ministry altogether on March 4, 2024, thereby reducing the number of people it can serve from thousands of families to none. The Church has also had to reject donations and tell donors that it cannot accept food and supplies because of the City—threatening relationships that it had built over the course of decades, especially with farmers who often give the ministry their excess fresh produce. These harms not only prevent the Church from feeding the hungry, but also interfere with the Church's ability to share the Gospel and follow Jesus' commands.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must ordinarily show (1) "likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[.]" *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (cleaned up). This analysis applies a sliding scale approach, meaning that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The most important factor is likelihood of success on the merits. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). However, there are "serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary

injunction may still issue so long as the balance of hardships tips *sharply* in the [moving party's] favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quotation omitted).

**ARGUMENT**

Despite warmly supporting the Church's Food Ministry for years, Defendants have had an unconstitutional change of heart. In addition to engaging in efforts of increasing severity to clamp down on the Church, Defendants have not enforced the same ordinances against similarly situated nonreligious organizations that also use semi-trucks and store food in the same residential zone. Defendants are wielding the City's zoning code as a cudgel in a persistent lawfare campaign to stop the Church's ministry activities. Their treatment of the Church violates both federal and Arizona law and should be enjoined.

**I.      The Church Is Highly Likely to Succeed on the Merits.**

   **A.      Defendants' Improper Enforcement Against the Church Violates RLUIPA's Substantial Burden Provision.**

RLUIPA prohibits Defendants from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless that regulation is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). "[T]he land-use portion of RLUIPA targets a far broader kind of burden: regulations that have any substantial effect on a religious assembly's or institution's use, building, or conversion of real property owned by that" entity. *Apache Stronghold v. United States*, No. 21-15295, 2024 WL 884564, at *35 (9th Cir. Mar. 1, 2024) (en banc) (Bea, J., concurring in part and dissenting in part with per curiam opinion).

To begin, the Church's Food Ministry is a central component of its religious exercise. *See Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 727–29 (9th Cir. 2016) (finding church's homeless ministry, which included offering food, was "an integral part of its religious exercise"); *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538, 544 (D.D.C. 1994) (recognizing "acts of charity as

an essential part of religious worship is a central tenet of all major religions," and finding a church's food ministry was "religious conduct falling within the protections of the First Amendment and the RFRA."). For nearly twenty-five years, the Church has distributed food, clothing, water, and household supplies to the needy, and it often shares the Gospel and offers Bibles and other religious literature to any willing individuals who come to receive food. This ministry stems directly from God's teachings throughout Scripture, and is an outgrowth of the Church's mission to "help and provide for every necessity expressing the love and purpose of God for everyone."[4]

Through its misapplication of City land use ordinances, Defendants have burdened the Church's free exercise by (1) threatening enforcement action against the use of semi-trucks for delivering food and supplies to the Church under SLCC §§ 10.15.245 *et seq.*, (Doc. 1 ¶ 48, Ex. A); (2) reassessing the Church and its Food Ministry as a non-conforming commercial enterprise under SLCC § 18.80.030, (*id.* ¶ 55, Ex. C); (3) requiring the Church to move its Food Ministry and related distribution efforts away from the Church's property to a commercial or industrial zoning district, (*id.* ¶ 59, Ex. D); (4) requiring the Church to acquire a CUP to continue its Food Ministry under Code § 18.100.030, even though such an application is unnecessary and would be onerous, expensive, and almost certainly futile, (*id.* ¶¶ 61–66 & Ex. F); and (5) issuing civil citations and threatening criminal enforcement against the Church's pastor, (*id.* ¶¶ 67, 71–75, Exs. H, I & J.) These actions have burdened the Church in at least three onerous ways.

*First*, Defendants' efforts to stop the Church from conducting its ministry at its current location have left the Church with no feasible alternative means to operate its ministry. This constitutes a substantial burden, especially when they have cut off the Church from using free offsite locations and the Church cannot afford (nor should be forced) to relocate. *See Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011) (courts should consider whether a religious institution "has no ready

---
[4] https://www.gethsemanifoodministry.org/en/food-ministry.

- 7 -

alternatives, or where the alternatives require substantial delay, uncertainty, and expense" (simplified)); *Harbor Missionary*, 642 F. App'x at 729 (the "City's denial of a [CUP] prevents the Church from conducting its homeless ministry at its current location" and the "substantial cost associated with relocating the site . . . demonstrates that the denial of the [CUP] substantially burdens the Church's religious exercise"); *see also Islamic Ctr. of Miss., Inc. v. City of Starkville*, 840 F.2d 293, 300 (5th Cir. 1988) ("[T]he availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits."); *Barr v. City of Sinton*, 295 S.W.3d 287, 303 (Tex. 2009) ("[A] burden on a person's religious exercise is not insubstantial simply because he could always choose to do something else.").

*Second*, by barring the Church from loading and unloading semi-trucks in its own parking lot for short periods of time, as allowed by City Code, Defendants have effectively barred the Church from operating its Food Ministry. *See Yellowbear v. Lambert*, 741 F.3d 48, 55–56 (10th Cir. 2014) (Gorsuch, J.) (whenever the government "prevents the plaintiff from participating in [a religious] activity," giving the plaintiff no "degree of choice in the matter," that action "easily" imposes a substantial burden on religious exercise).

And *third*, by imposing baseless civil citations and threatening criminal enforcement, Defendants have coerced the Church to curtail and cease its ministry. *See United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) (finding a substantial burden where "enforcement of [] regulations" threatened plaintiffs to "coerce them, via criminal sanctions, into abandoning conduct that is an exercise of religion" (simplified)).

As a result, the Church is suffering far "more than an inconvenience on religious exercise." *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 985 (9th Cir. 2006). Defendants' efforts have worked—by escalating their intimidation crusade from letters to weighty fines and potential criminal charges, they have forced the Church to bear the loss of its ministry efforts unless the City and its Mayor relent or this Court preserves its civil rights from such infringement.

The governmental interests here are not "interests of the highest order" that could

satisfy RLUIPA. *Foursquare Gospel*, 673 F.3d at 1071. While municipalities and their officials undoubtedly have an interest in *uniformly* enforcing zoning codes for the safety and orderliness of the local community, arbitrary and selective enforcement of those codes necessarily undermines the strength of the government's stated interest. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 541–42 (2021). No rational explanation exists for why similarly situated entities, such as Head Start, may park semi-trucks to load and unload food supplies mere blocks away for hours and even days at a time, within the same residential zone, while the Church may not. This selective enforcement simply reveals that Defendants do not view their own stated interests as compelling enough to enforce them evenhandedly.

The situation is made worse by the fact that the City Code provides an exception as of right for loading and unloading a semi-truck for up to two hours in residential zones, *see* SLCC § 10.15.255(D), but Defendants will not allow the Church to do so *at all*. Indeed, when a semi-truck briefly parked in front of the Church *by mistake*, Defendants issued civil citations to the Church's pastor. Defendants have no legitimate interest in refusing to allow the Church to utilize exceptions codified in the City's own ordinances.

Defendants' efforts to enforce the City Code are also not narrowly tailored. *See Hoffman*, 436 F. Supp. 3d at 1289 (this "standard is exceptionally demanding" and requires showing "no alternative forms of regulation would suffice" (simplified)). The Church has moved almost all food storage off its property and agreed to abide by all City ordinances regarding its semi-truck.[5] And the Church has temporarily stopped bringing the semi-truck to its property entirely, opting to have deliveries arrive offsite and manually bringing supplies to the Church in smaller box trucks. Nevertheless, Defendants have been intransigent, unwilling to discuss any compromise, and instead have issued or threatened civil and criminal enforcement against the Church's pastor. Because Defendants have

---

[5] The Church does not concede that it cannot engage in appropriate food storage on its property, nor does it concede that a semi-truck may not park on or near its property for brief periods. It only means to demonstrate the lengths to which it has gone to cooperate with the City. Rather than appreciate those efforts at comity, the City has repeatedly cited the Church, even for the actions of a third party over which it has little or no control.

refused to even consider less restrictive measures—much less *the least* restrictive—it necessarily fails narrow tailoring. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Educ.* ("*FCA*"), 82 F.4th 664, 694 (9th Cir. 2023) (en banc).

### B. Defendants' Enforcement Actions Violate RLUIPA's Equal Terms Provision.

RLUIPA also prohibits Defendants from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The elements are met here: (1) there is an imposition or implementation of a land-use regulation, (2) by a government, (3) on a religious assembly or institution. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1170 (9th Cir. 2011). And most importantly, Defendants' imposition of the City's ordinances to the Church is "on less than equal terms with" comparable nonreligious institutions within the same zone. *Id.* at 1171.

Defendants have taken escalating steps to prevent the Food Ministry's operations, pointing sometimes to the use of semi-trucks in the City's residential zone and other times to the Church's food storage on its property. In doing so, they rely on various City Code provisions regulating traffic in residential zones, as well as their position that the "distribution, storage, and traffic generated by the food distribution [of the Food Ministry] clearly alter the nature and character of the non-conforming use." (Doc. 1 ¶ 54, Ex. C.) To that end, Defendants informed the Church that its ministry can only take place in a commercial or industrial zoning district. (*Id.* ¶ 59, Ex. D.)

But Defendants have not enforced these rules equally or uniformly. Such failure constitutes a clear violation of RLUIPA's Equal Terms prohibition. *See* 42 U.S.C. §2000cc(d)(1). Within blocks of the Church, either in the same R1-6 or comparable residential zones, Defendants have not enforced the Code against 18-wheeler semi-trucks and other commercial vehicles that regularly park, unload, and load on streets and in front of residences, sometimes for hours or even days at a time. These vehicles provide services from FedEx, furniture stores, food trucks, a tow truck company, and other deliveries.

Most strikingly, the nearby Head Start program regularly receives semi-truck deliveries of the same types of supplies—food and sundries—to conduct its nonreligious public service mission. (*See* Doc. 1 ¶ 84.) On information and belief, that Head Start location stores these materials onsite for similar periods as the Church, and for similar charitable purposes. Such efforts are nearly indistinguishable from the Church's Food Ministry, save for its nonreligious motivation.

While these entities are apparently permitted to operate without interference, Defendants have taken the position that the Church is different. Indeed, Defendants do not even allow semi-trucks to be present at the Church more than five minutes, much less the two-hour unloading and loading period allowed in residential areas. *See* SLCC § 10.15.255(D). As such, the Church is being "treated on a less than equal basis with [these] secular comparator[s]" that are "similarly situated with respect to [the City's] zoning criteria." *Centro Familiar*, 651 F.3d at 1173.

Defendants' interests, no matter how compelling, are irrelevant under RLUIPA's Equal Terms provision. *See id.* at 1171–72 (noting "we cannot accept the notion that a 'compelling governmental interest' is an exception to the equal terms provision, or that the church has the burden of proving a 'substantial burden' under the equal terms provision"). Unlike other parts of RLUIPA, the text does not provide for interest-balancing "to see if the government can excuse the equal terms violation." *Id.* at 1171 (simplified). Importantly, the "burden is not on the church to show a similarly situated secular assembly, but on the [Defendants] *to show that the treatment received by the church should not be deemed unequal*, where it appears to be unequal on the face of the ordinance." *Id.* at 1173 (emphasis added).

Moreover, nothing in RLUIPA's Equal Terms provision considers the government's motives in its disparate treatment. This rule is straightforward: when the government treats nonreligious and religious organizations differently, it has violated the law. Thus, no motivations, objectives, or interests—compelling or otherwise—can save Defendants' unequal treatment of the Church and Head Start or the numerous commercial vehicles to

which Defendants routinely turn a blind eye. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 389 (7th Cir. 2010) (Sykes, J., dissenting) (RLUIPA "reflects a congressional judgment" that laws treating "religious assemblies or institutions less well than nonreligious assemblies or institutions are inherently not neutral"); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007) (Jordan, J., concurring in part and dissenting in part) (inquiring about a city's zoning objectives would give it "a ready tool for rendering [the Equal Terms provision] practically meaningless").

Finally, any ambiguity should be resolved in light of the express command to construe RLUIPA "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3. The Church is likely to succeed under both prongs of its RLUIPA claim.

**C. Defendants' Enforcement Actions Violate the Church's Right to Free Exercise under the First Amendment.**

The Free Exercise Clause, which applies to the States by incorporation under the Fourteenth Amendment, provides that government entities shall make no law "prohibiting the free exercise" of religion. U.S. Const. amend I. This well-established axiom provides that the "government may not constitutionally 'treat *any* comparable secular activity more favorably than religious exercise," *FCA*, 82 F.4th at 686 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)), forbidding both "subtle departures from neutrality" and "covert suppression of religious beliefs." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

The Free Exercise Clause also expressly protects against government actions that are coupled with "official expressions of hostility to religion," whether subtle or overt. *FCA*, 82 F.4th at 690. This is especially true where "government actions [are] coupled with 'official expressions of hostility to religion.'" *Id.* (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 639 (2018)). As such, any governmental act "burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny" in which the government must advance "interests of the

highest order" that are "narrowly tailored" to those interests. *Lukumi*, 508 U.S. at 546; *see also See San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (zoning laws directed toward and burdening free exercise must satisfy strict scrutiny).

This case is a textbook example of what the Free Exercise Clause prohibits. Defendants have wielded the City Code in a discriminatory manner against the Church in order to stop the Church from exercising its sincerely held religious beliefs—to feed the hungry and provide for the needy. This cannot stand. *Supra* at 6–7.

Moreover, without a doubt, Defendants' actions preventing the Church from carrying out its Food Ministry impose a burden on its religious exercise. Defendants have accomplished this by misapplying the City code, issuing letters and enforcement actions with escalating tone and consequences, *see supra* at 3–4, 7–8, and removing benefits that the Church previously enjoyed. Together, these actions have forced the Church to pause its ministry in recent weeks in the face of potential mounting fines and increased pressure.

At first blush, Defendants' references to the Zoning Code may suggest that they are merely enforcing generally applicable laws. But this could not be further from the truth. In acts of overt hostility, Defendants are engaging in targeted intimidation efforts by sending increasingly stringent cease-and-desist notices and baselessly citing the Church's pastor for passing out food to poor. By intentionally or carelessly misapplying the City Code—such as improperly classifying the Food Ministry as "commercial" and refusing to allow the Church to operate its semi-truck even within the bounds of the City Code—Defendants reveal that their actions are anything but neutral. *See Fulton*, 593 U.S. at 533.

Defendants also betray their true intentions by selectively enforcing the Code against the Church for its use of semi-trucks or food storage without applying the same provisions against similarly situated nonreligious entities in the area. *See Tandon*, 593 U.S. at 62. The Mayor has also engaged in other hostile efforts to hamper the ministry, including by revoking the Church's access to a City-owned warehouse, where the Church previously stored donations with the City's encouragement and approval, and withholding small monetary grants that the City had historically provided to the Church's ministry. *See*

- 13 -

*Masterpiece Cakeshop*, 584 U.S. at 639.

These acts are no incidental burden on the Church's free exercise, but rather reveal a concerted campaign through lawfare and intimidation to compel the Church to choose between mounting penalties and ending its ministry to the needy. As previously explained, *see supra* at 9–10, these actions are not narrowly tailored to promote any alleged interests in upholding City Code. Defendants' restrictions on the Church's Food Ministry violate the Church's free exercise rights.

### D. Defendants' Enforcement Actions Violate the Arizona Free Exercise of Religion Act.

In Arizona, the "[f]ree exercise of religion is a fundamental right that applies in this state even if laws, rules or other government actions are facially neutral." A.R.S. § 41-1493.01(A). Arizona's FERA, therefore, closely mirrors RLUIPA and was implemented "to protect Arizona citizens' right to exercise their religious beliefs free from undue governmental interference." *State v. Hardesty*, 222 Ariz. 363, 365 ¶ 8 (2009).

#### 1. Defendants' Actions Have Created an Unlawful Substantial Burden.

Under FERA, a plaintiff must show that: "(1) [its] action or refusal to act is motivated by a religious belief, (2) the religious belief is sincerely held, and (3) the government's regulation substantially burdens the free exercise of [its] religious beliefs." *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 297 ¶ 127 (2019); *see also* A.R.S. §§ 41-1493(2), -1493.01(B). The burden then "shifts to the government to show that the law (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest." *Brush & Nib*, 247 Ariz. at 297–98 ¶ 127; A.R.S. § 41-1493.01(B).

"Under the least restrictive means test, the government must show that "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Brush & Nib*, 247 Ariz. at 302 ¶ 149 (citation omitted). And even if the government can demonstrate a compelling interest, it still cannot impose an "unreasonable burden" unless: (a) "[t]hat the person's exercise of religion at a particular

location violates religion-neutral zoning standards enacted into the government's laws at the time of the person's application for a permit," (b) "[t]hat the person's exercise of religion at a particular location would be hazardous due to toxic uses in adjacent properties," or (c) "[t]he existence of a suitable alternate property the person could use for the exercise of religion." A.R.S. § 41-1493.03.

Once again, Defendants impose a substantial burden against the Church by misapplying the law and compelling it, using civil penalties and the threat of criminal punishment, to pause its sincere, religiously-motivated food distribution efforts. *See Brush & Nib*, 247 Ariz. at 298 ¶ 131. "[T]he coercion the Ordinances place[] on [the Church] to abandon [its] religious belief is unmistakable." *Id.* at 299 ¶ 135. And Defendants have no compelling interest in shutting down the ministry. But even if they did, Defendants cannot demonstrate that the Church violated any zoning laws that were in place in 1999 when the Church began its Food Ministry or in 2012 when the City implemented its current zoning codes. Nor can they show that the Church's activities are hazardous, that any financially feasible alternative is available for the Church to conduct the ministry, or that there are no other means of enforcing the Zoning Code. Indeed, the Church has voluntarily engaged in or proposed less restrictive options in an effort to compromise with Defendants, always at its own inconvenience. *See id.* at 302 ¶ 149. And the fact that the City Code already allows residential semi-trucks in certain circumstances belies any argument that there are no other means by which the Church can lawfully continue its Food Ministry. *Id.* at 303 ¶ 156.

    2.  <u>Defendants Are Engaged in Unlawful Unequal Treatment</u>.

FERA further provides that the "[g]overnment shall not impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, regardless of a compelling governmental interest." A.R.S. § 41-1493.03(B). The relevant facts and analysis by now are familiar: despite heavy-handed enforcement actions against the Church's ministry, Defendants have shown little interest in applying those same rules to anyone else. Over the last few months, Defendants have permitted semi-trucks and other commercial vehicles to park, load, and

unload in the same residential zone, including at the local Head Start program only blocks from the Church. Because Defendants are imposing requirements on the Church that they do not impose on nonreligious entities in the same zone, they blatantly violate FERA.

## II. The Church Is Suffering Irreparable Harm Absent an Injunction.

Without injunctive relief, the Church has faced and will continue to face irreparable harm. Irreparable harm is "relatively easy to establish" in the First Amendment context because the Church "need only demonstrate the existence of a colorable First Amendment claim." *FCA*, 82 F.4th at 694–95. "It is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

As a direct result of Defendants' actions, the Church significantly curtailed its Food Ministry, stopped utilizing necessary infrastructure, and can no longer serve the needy in its community. In the last two weeks, the Church paused its ministry entirely because it cannot afford the mounting fines and possibility of criminal penalties. In doing so, the Church has lost a primary method of sharing the Gospel.

Moreover, there is nowhere else the Church can restart operations, as the Church lacks the resources to buy another building and the City, at the direction of Mayor Nieves, refuses to allow the Church to use any public property—including the park bordering the Church's property—to engage in its religious exercise. And Defendants' actions have forced the Church to reject donations and inform donors that it cannot accept food and supplies because of the issues with the City. The Church built these charitable relationships over decades, and its inability to receive donations threatens the continuation of those relationships.

## III. The Balance of Equities and the Public Interest Favor an Injunction.

When a government entity is a party, it is appropriate to "consider the balance of equities and the public interest together." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). In challenges to government action that affects the exercise of constitutional rights, "[t]he balance of equities and the public interest . . . tip[s] sharply in favor of enjoining the"

law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Further, "injunctions protecting First Amendment freedoms," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), and "religious liberty and conscience" are always in the public interest, *Azar*, 911 F.3d at 582. On the other hand, a government entity "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Haynes v. Off. of the Att'y Gen. Phill Kline*, 298 F. Supp. 2d 1154, 1160 (D. Kan. 2003) (citing *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983)). Nor can it "suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Here, there is no strong argument in favor of the government's interest that Defendants' own actions have not undermined. And although a court's role in enjoining a governmental entity should not be taken lightly, an abstract harm is "not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (simplified). That is particularly the case here, where government actors have not shown even-handed zealousness in enforcing their own ordinances.

Moreover, "all citizens" in San Luis "have a stake in upholding the Constitution," particularly when the Church's religious exercise directly promotes the public interest by providing for the needy. *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). No city should argue, at least in good conscience, that its misapplied zoning ordinances are more important than the exercise of sincerely held faith and charity. As a result, the balance of the equities and the public interest also "tip[] sharply" in the Church's favor. *Cottrell*, 632 F.3d at 1311.

## **CONCLUSION**

For the foregoing reasons, the Church respectfully requests that this Court grant its Motion for Preliminary Injunction.

DATED this 14th day of March, 2024.

                          SNELL & WILMER L.L.P.

By: /s/ Ryan J. Regula
Ryan J. Regula
Charlene A. Warner
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070

David J. Hacker (*pro hac vice forthcoming*)
Jeremiah G. Dys (*pro hac vice forthcoming*)
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: 972.941.4444
dhacker@firstliberty.org
jdys@firstliberty.org

Camille P. Varone (*pro hac vice forthcoming*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue, N.W.
Suite 1410
Washington, D.C. 20004
Telephone: 202.921.4105
cvarone@firstliberty.org

Steven D. Keist (#11251)
KEIST THURSTON O'BRIEN
10150 W. Desert River Blvd.
Glendale, Arizona 85037
Telephone: (623) 937-8888
steve@ktolawfirm.com

*Attorneys for Plaintiff Gethsemani Baptist Church*

# CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of March 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System. As no other parties have yet made an appearance, the attached document will be served on the following persons concurrently with service of the complaint and summons and in compliance with Fed. R. Civ. P. 5:

**City of San Luis**
1090 East Union Street
San Luis, AZ 85349

**Nieves G. Riedel**
City of San Luis City Council
1090 East Union Street
San Luis, AZ 85349

**Jenny Torres**
City of San Luis City Administration
1090 East Union Street
San Luis, AZ 85349

**Alexis Gomez Cordova**
City of San Luis Building Safety
1090 East Union Street
San Luis, AZ 85349

s/ Tracy Hobbs