1  Ryan J. Regula (#028037)
   Charlene A. Warner (#037169)
2  SNELL & WILMER L.L.P.
   One East Washington Street
3  Suite 2700
   Phoenix, Arizona 85004-2202
4  Telephone:  602.382.6000
   rregula@swlaw.com
5  cwarner@swlaw.com

6  David J. Hacker (TX #24103323, *pro hac
   vice*)
7  Jeremiah G. Dys (TX #24096415, *pro hac
   vice*)
8  FIRST LIBERTY INSTITUTE
   2001 W. Plano Parkway, Suite 1600
9  Plano, Texas 75075
   Telephone: 972.941.4444
10 dhacker@firstliberty.org
   jdys@firstliberty.org
11

Camille P. Varone (DC #161724, *pro hac
vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue, N.W., Suite
1410
Washington, D.C. 20004
Telephone: 202.921.4105
cvarone@firstliberty.org

Steven D. Keist (#11251)
KEIST THURSTON O'BRIEN
10150 W. Desert River Blvd.
Glendale, Arizona 85037
Telephone: (623) 937-8888
steve@ktolawfirm.com

*Attorneys for Plaintiff Gethsemani Baptist
Church*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Gethsemani Baptist Church, an Arizona nonprofit corporation,<br><br>   Plaintiff,<br><br>  v.<br><br>City of San Luis, a political subdivision of the State of Arizona,<br><br>   Defendant. | No. 2:24-cv-00534-GMS<br><br>**FIRST AMENDED VERIFIED COMPLAINT**<br><br>(Jury Trial Demanded) |

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

For its First Amended Verified Complaint, Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.　　For decades, Plaintiff Gethsemani Baptist Church (the "Church") has operated a food ministry as part of its religious mission to support some of the most vulnerable families in the southernmost part of Yuma County and across the border in Mexico. Through this ministry, the Church fills a critical need in the City of San Luis (the "City") by sharing the Gospel and donating food and other supplies, which it ferries to its property using a semi-truck. Because no other food ministries exist within the City, the Church's charitable activities have been a blessing for the community, with the City often celebrating or even participating in the Church's ministry efforts.

2.　　However, the election of a new mayor in December 2022 heralded a major shift in the City's approach. Although the Church had operated the food ministry in the same manner for approximately twenty-three years without complaint, the City suddenly turned hostile, bombarding the Church with a series of accusations that the Church's use of its property and semi-trucks violate the City's Zoning Code, and threatening to take enforcement action if the Church does not cease its operations. Although the Church disclaimed that any of its operations were currently illegal, and committed to rectifying any potential issues moving forward, the City refused to discuss a solution that would allow the ministry to continue—even resorting to citing the Church's pastor for passing out food to just a few hungry people. Accordingly, the Church has been forced to bring this action to protect its ability to exercise its religious beliefs.

3.　　The City's actions heavily burden the Church's religious exercise, violating its constitutional and statutory rights. The Church accordingly seeks declaratory and equitable relief and nominal damages to prevent the City from violating its fundamental rights to share the Gospel by feeding the hungry.

## PARTIES, JURISDICTION, AND VENUE

4.　　Plaintiff Gethsemani Baptist Church is an Arizona 501(c)(3) nonprofit religious organization located in an R1-6 Single Residence Zoning District at 1010 B Street,

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

San Luis, AZ 85349, only a couple of blocks from the Mexico border. The Church is led by Pastor Jose Manuel Castro ("Pastor Castro").

5.     Defendant City of San Luis is a city located in Yuma County, Arizona, and is organized pursuant to Title 9 of the Arizona Revised Statutes.

6.     This civil rights action raises federal questions under the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*., and state-law questions under the Arizona Free Exercise of Religion Act ("FERA"), A.R.S. §§ 41-1493 *et seq*.

7.     This Court has original jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343, and it has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the claims brought under federal law.

8.     For the federal claims, this Court can grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and Federal Rules of Civil Procedure 57 and 65, and for the state-law claims, it can grant the requested relief under A.R.S. §§ 41-1493.01(D), 12-1801, 12-1831, and Arizona Rule of Civil Procedure 65.

9.     The Court can award the requested nominal damages for the federal claims under 28 U.S.C. § 1343, and it can grant costs and attorneys' fees for all claims under 42 U.S.C. § 1988 and A.R.S. 41-1493.01(D).

10.    Venue in the District of Arizona is proper under 28 U.S.C. § 1391(e) because (a) a substantial part of the events and omissions giving rise to the claim occurred in this district—namely, the City's improper enforcement of its zoning laws against the Church, and (b) a substantial part of property that is the subject of the action is situated in the district.

## GENERAL ALLEGATIONS

I.     **Since 1999, the Church Has Operated a Food Ministry to Serve the Local San Luis Community.**

11.    Gethsemani Baptist Church is a member of the Arizona Southern Baptist

Convention and has been an integral part of the City since its founding in 1986.

12. In December 1999, the Church began the Gethsemani Food Ministry (the "Food Ministry") as an expression of its religious beliefs encompassed by its motto, "Passion for God, Compassion for Others."

13. As an extension of its dedication to sharing the Gospel with the community, the Food Ministry's religious mission is to "help and provide for every necessity expressing the love and purpose of God for everyone."[1]

14. The Church's religious beliefs stem directly from Jesus' teachings in Matthew 25:35–40, which states: "For I was hungry, and you fed me. I was thirsty, and you gave me a drink. I was a stranger, and you invited me into your home. I was naked, and you gave me clothing. I was sick, and you cared for me. I was in prison, and you visited me."

15. Similar teachings appear throughout Scripture: "It is a sin to despise one's neighbor, but blessed is the one who is kind to the needy . . . whoever is kind to the needy honors God." *Proverbs* 14:21, 31 (New Int'l Version) ("NIV"). "He upholds the cause of the oppressed and gives food to the hungry." *Psalm* 146:7 (NIV). "Suppose there is a righteous man who does what is just and right . . . He does not commit robbery but gives his food to the hungry and provides clothing for the naked." *Ezekiel* 18:5, 7 (NIV).

16. For nearly 25 years, the Church has distributed food, clothing, water, and other household supplies to the poor and needy in its community through the Food Ministry.

17. In addition to hosting food drives throughout the week, the Church has served approximately three hundred families every Saturday between 7:00 a.m. and 11:00 a.m., where it often shares the Gospel and provides Bibles and other religious literature to any willing individuals who come to receive free food.

18. Additionally, the Church sometimes donates excess food and supplies to other churches or community programs with similar missional convictions.

19. The Church's religious efforts are strengthened by its ability to conduct its

---

[1] https://www.gethsemanifoodministry.org/en/food-ministry.

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Food Ministry on site. When individuals arrive to collect free food, they must first walk through the Church's sanctuary, where Pastor Castro tells them about Jesus and prays for them. By conducting its ministry at the Church, the Church believes the location presents a unique opportunity to point people to faith while meeting their physical needs.

20.     During the life of the Food Ministry, the Church has distributed hundreds of thousands of pounds of free food to the poor, other churches and ministries both inside and outside the City, and even across the border into Mexico.

21.     While the Church primarily serves the City's community and its neighbors across the Mexico border, it has provided food to families in Somerton, Yuma, and nearby cities in California.

22.     The Church regularly provides free food and supplies to hungry migrants and has seen this part of its ministry increase in recent years.

23.     The Church does not require proof of need or any other qualifications before offering its help.  If someone has a need, the Church seeks to meet that need as an extension of its Gospel-based mission.

24.     The Church has donated over 1,500 free Thanksgiving turkey plates, given away over 100 bicycles, and distributed thousands of personal hygiene products. And during the pandemic, the Church organized approximately 15 drive-thru events, which served over 400 impoverished families, thereby ensuring that their access to essential needs remained uninterrupted.

25.     Like most non-profits and churches, the Food Ministry relies on voluntary donations to carry out its religious mission. The Food Ministry is largely supported by other churches and organizations throughout the southwestern United States, who either donate pallets of food to the Church directly or provide charitable funding to purchase supplies and cover overhead costs.

26.     In addition to receiving voluntary tithes and offerings from church attendees, which is a standard religious practice for many Christian churches, the Church occasionally accepts small, wholly voluntary donations from congregants or other community members

who wish to support the Food Ministry, as well as support the Church's other ministerial outreach to prisons, orphanages, and senior centers.

27. The Church's ability to receive tithes, offerings, and donations is essential to the Church's free exercise of religion. Likewise, making tithes, offerings, and donations to the Church and to support its ministries is a fundamental part of individual believers' and congregants' free exercise of religion.

28. Some donors give without seeking to receive anything from the Food Ministry. Others only give a few dollars and receive as much food and household items as they wish, the value of which usually greatly exceeds the donation (sometimes by hundreds of dollars). Some also give out of religious devotion.

29. However, many needy individuals receive from the Food Ministry without giving any money at all. The ministry does not require or imply that it requires a donation to receive charitable food or supplies, nor is the amount of charitable giving of food and supplies tied in any way to whether a donation was given. Nor does the Church charge any fee to those receiving free meals or any other type of supplies from the Church, and it has never turned anyone away for not donating to the ministry.

30. The Church's Food Ministry is not a commercial enterprise and does not generate profit or operate for profit, but rather is an important part of its Christian ministry to feed the needy and preach the Bible.

31. For about 14 years, the Church stored most of its food and other supplies at a warehouse owned by the City.

32. The Church has also used a semi-truck to transfer food to its property to facilitate its distribution efforts since around 2002.

33. The Church's use of the semi-truck to transfer food to and from its property is fundamentally tied to the Church's use of the property for its Food Ministry.

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

34.     After picking up food from the warehouse, the semi-truck would drive in from B Street and then turn into the large, paved parking lot in front of the Church, where it would unload the food. It would then depart on Babbitt Lane, which is located parallel to B Street on the other side of the church.



35.     Typically, any food that was dropped off by the semi-truck would be temporarily kept in the sanctuary for distribution to the needy, and would either be donated by the end of the day or taken back to the warehouse. This temporary food storage is also fundamental to the operation of the ministry. While some non-perishable food was also historically stored longer on Church property, the Church has dramatically reduced that amount to the bare minimum over the last several months and has committed to ensuring that nothing is stored long-term.

36.     Further, all loading and unloading took place in the Church's parking lot, and at no point did the Church unload or park the semi-trucks on residential streets around it.

37.     The Church has also never received any kind of citation for health code violations, and it has passed every annual inspection from the County—including one only a few months ago.

38.     When not in use, the two semi-trucks owned by the Church, as well as a

couple of smaller box trucks with trailers, are stored approximately half a mile from the Church in a business complex.

39.     Since 2012, when the City adopted its current Zoning Code, the City designated the Church and its Food Ministry as a "legal nonconforming use," meaning that it could continue to operate its pre-established religious services and Food Ministry at the B Street location in the residential zone. The Church was not required to pursue a Conditional Use Permit ("CUP") or obtain further permission from the City to continue the existing ministries. As relevant here, § 18.100.030 of the Zoning Code provides that a "legal nonconforming use may continue only in the manner and to the extent that it existed at the time of such enactment, amendment, or annexation."

40.     While the Food Ministry has certainly grown in scale in the years since its founding, requiring larger trucks as early as 2002 to effectively transport food and supplies, it has not dramatically changed in scope or character since the Zoning Code was adopted.

## II.     Despite Decades of Cooperation, the City Suddenly Demands that the Church Cease Operating its Food Ministry.

41.     For most of the Church's history, the Church and its Food Ministry had a positive working relationship with the City, which had never complained about the Food Ministry's operations nor informed the Church that its use of semi-trucks on its property violated the City Code.

42.     In fact, not only was the City well aware of the Church's Food Ministry and use of semi-trucks, but it actively supported it.

43.     For instance, the City occasionally provided the Church with grant money to support its ministry.

44.     Multiple previous city councilmembers helped with the Food Ministry in the past, often participating in food drives that took place on City property.

45.     And on several occasions, the Church's semi-trucks were invited by the City to participate in parades and other community events, such as Safety Day and Founder's Day. During these events, over 100 people would receive free meals as part of the Church's

- 8 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

outreach efforts.

46.    However, when a new mayor, Mayor Nieves Reidel, was elected in late 2022, everything changed.

47.    The Mayor made clear that the Church's Food Ministry would receive no more support from the City.

48.    Shortly after taking office, the Mayor informed the Church that it could no longer use the City warehouse to store food or supplies—forcing the Church to move nearly 100 pallets of food to a different warehouse located outside the City.

49.    Although there is a public park across from the Church, the Mayor would not allow the Church to utilize any of that area for activities related to its Food Ministry.

50.    The Mayor also unsuccessfully attempted to veto the City Council's approval of approximately $7,000 in grant money, which the City had frequently given to the Church in the past. The City Council overrode her attempted veto.

51.    Then, on September 11, 2023, Pastor Castro received a letter from Acting City Manager Jenny Torres, at the Mayor's direction, informing the Church of the City's policy that "per city code semi-trucks are not permitted in residential areas," and that the City would "commence enforcement at the church of the no semi-trucks in the residential neighborhood." [Ex. A, 09/11/2023 Enforcement Letter from Torres to Castro.]

52.    Attached to the letter were several Code provisions, including:

- § 10.15.245, which provides that "[u]pon any street outside of a business or residence district, no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the roadway when it is practicable to stop, park or so leave the vehicle off that part of the roadway."

- § 10.15.250, which provides that "[n]o person shall stand or park a vehicle with a rated chassis capacity in excess of three-fourths of a ton or a tractor, semitrailer, trailer or bus on a local street in a residential area except during the process of loading or unloading the vehicle.

- § 10.15.255, which provides in relevant part that (A) "[t]he parking of any commercial vehicle of more than one-and-one-half-tons' capacity on any lot in any residential area shall be considered a commercial use and is prohibited," and that (D) "[n]o person shall stop, stand, park or store a

- 9 -

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1   |   disabled vehicle or vehicles, or a trailer or a trailer loaded
2   |   with a vehicle, on any street, alley or right-of-way in any
    |   residential or commercial area of the City for a period of
3   |   more than two hours."

4   53. This enforcement threat came as a surprise to the Church, as it did not use the

5   street to park the semi-truck.

6   54. And to the extent it used its own parking lot to load and unload the truck, the

7   Church agreed that it would keep those efforts to under two hours, as permitted by City

8   Code §§ 10.15.250 and -255(D). [Ex. B, 09/27/2023 Letter from J. Dalfanso to City.]

9   55. The Church does not concede that it cannot engage in appropriate food

10  storage on its property, nor that a semi-truck may not load or unload goods on or near its

11  property for brief periods of time, in accordance with the City Code. *See* SLCC § 10.15.010

12  (defining "Park" or "Parking" to mean "the standing of a vehicle, whether occupied or not,

13  upon a street ***otherwise than temporarily for the purpose of, and while actually engaged***

14  ***in***, receiving or discharging passengers ***or loading or unloading merchandise***. . ."

15  (emphasis added)).

16  56. Nevertheless, to avoid police enforcement in the short term, the Church

17  immediately began unloading the semi-truck at a location approximately one mile away

18  from its property and utilizing a small trailer to ferry food and supplies to the Church.

19  57. This change immediately and significantly hampered the Church's ministry

20  efforts and drastically reduced the food distribution to no more than 50 people at a time.

21  58. But the City and Mayor's efforts did not stop there. On September 29, 2023,

22  the City Planning and Zoning Commission ("P&Z"), through City Code Enforcer Alexis

23  Gomez Cordova, sent a Notice of Zoning Violation to the Church stating that the Food

24  Ministry itself violated the City's zoning code. [Ex. C, 09/29/2023 Letter from P&Z to

25  Castro.]

26  59. Specifically, the letter articulated the City's policy and practice: that although

27  it considered the Church and its Food Ministry to be a legal non-conforming use under

28  SLCC § 18.100.030, the "distribution, storage, and traffic generated by the food distribution

activity clearly alter the nature and character of the non-conforming use, constituting an illegal change to the non-conforming use." [*Id.*]

60.     Accordingly, the City, under letterhead from P&Z, demanded that the Church "rectify these violations" within thirty days and stated that such rectification "includes ceasing all commercial level food storage or distribution." [*Id.*] The City also reserved the right to pursue all legal remedies against the Church. [*Id.*]

61.     On September 27, 2023, during a City Council meeting, Pastor Castro and over 100 community members pled with the Council and the Mayor to allow the Church to have its semi-truck enter the Church parking lot to load and unload the food for up to two hours in compliance with City Code.

62.     Pastor Castro also emphasized that the Food Ministry was a charitable religious ministry, not a commercial business.

63.     However, the City simply ignored the Church's pleas. On October 4, 2023, Mayor Riedel sent a letter in which she reiterated the City's policy and practice: that food distribution on the Church's property violated the City's zoning code, and that the only place the food distribution would be permitted in the City is in a commercial or industrial zoning district. [Ex. D, 10/04/2023 Letter from Riedel to Castro.]

64.     In other words, as demonstrated by these communications from City officials, is the City's policy and practice under its zoning code that charitable food distribution is a commercial enterprise, and that a church may not engage in legal nonconforming use of its property by distributing food in a residential district.

65.     On November 2, 2023, the Church sent a letter to Mayor Riedel and the City Council informing them that the City's actions were unconstitutional, and that the City had misapplied its Code against the Church regarding the use of semi-trucks. [Ex. E, 11/02/2023 Letter from Provident Law to City Council.]

66.     However, in its response on November 7, 2023, the City continued to insist that the Food Ministry constituted "commercial food storage, preparation, or distribution," because, according to the letter, (1) Pastor Castro did not operate the ministry at 1010 B

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Street until 2018, (2) the distribution activities had increased in both nature and intensity over time, and (3) the Church was being used to warehouse and distribute "thousands of pounds" of food. [Ex. F, 11/07/2023 Letter from City to Provident Law.][2]

67.     Accordingly, the City stated that that under Code § 18.100.030, the Church could not operate the Food Ministry without a CUP. [*Id.*] This letter was the first time that the City informed the Church that it must seek a CUP to operate.

68.     As shown by this communication, it is also the City's policy and practice that a church may not operate a legal nonconforming food ministry in a residential district without a CUP.

69.     However, the City's justifications for requiring the Church to apply for a CUP are simply incorrect.

70.     First, Pastor Castro has been loading and unloading semi-trucks of food on the Church's property at 1010 B Street almost every day for nearly 20 years—a fact of which the City was not only aware, but actively supported. [Ex. G, 11/13/2023 Letter from Provident Law to City, at 2–3.]

71.     Moreover, the Church does not store "thousands of pounds" of food on its property. Again, most of the Church's food is stored off-site, and any food on Church property is either donated that day or taken back to the warehouse. And although some long-term food storage took place on its property in the past, the Church has actively taken steps to ensure that is no longer an issue. [*Id.* at 1–3.]

72.     Finally, although its practice of accepting small donations has always been completely voluntary and never required in exchange for food, the Church proposed that it would no longer request small donations solely to remove any misconceptions that the Food Ministry was a commercial effort.

73.     Nevertheless, the City refused to budge. On December 7, 2023, the City sent

---

[2] The November 7 Letter suggests that the food distribution previously took place in another location near 530 Archibald Street, which is located in a general commercial zone. This location served as the licensing address for a mobile kitchen, which was not directly part of the Food Ministry that has always taken place on church property. [Ex. G at 2–3.]

the Church another letter accusing the Church of "routinely operating vehicles in a way that violates numerous provisions of the San Luis City Code and the laws of the State of Arizona," parking the truck on its property, and violating an unspecified list of "traffic and motor vehicle laws." [Ex. H, 12/07/2023 Letter from City to Provident Law, at 1–2.]

74.     It also continued to insist that the Church was engaged in "commercial level food distribution" that required a CUP, and suggested that the Church was posing a "public nuisance" and a health risk by "storing" food on the property. [*Id.*]

75.     Because of the City's threats, the Church ceased almost all Food Ministry efforts and cancelled multiple events, including its annual Thanksgiving turkey drive-thru and its Christmas toy drive.

76.     However, the City's crusade against the Church still did not abate.

**III.     The City Has Escalated Its Intimidation Crusade Against the Church by Threatening and Extracting Civil and Criminal Penalties on Its Pastor.**

77.     On February 22, 2024, Pastor Castro was handing out small quantities of emergency food supplies to a small group of about 10 people, which he was actively unloading from the small box truck in the Church parking lot. At the time, approximately two pallets of food were present on Church property.

78.     Without warning, under direction from the City and the Mayor, City Code Enforcer Alexis Gomez Cordova entered the Church property and issued four citations against Pastor Castro for (1) unspecified "[u]se of property . . . not permitted in" a residential zone under City Code § 18.05.110(A), and (2) "construction" of an enclosing wall, shade structure, and walk-in cooler "without a building permit" under City Code § 15.10.990(A), even though all of those structures were built by the Church nearly 30 years ago. [Ex. I, 02/22/2024 Citation Form.]

79.     Less than a week later, on February 28, 2024, there was a mistake with a donation delivery. The semi-truck driver was supposed to deliver supplies to another location, away from the Church, but he showed up at the Church instead. Pastor Castro immediately ran outside and asked the driver to take the truck away. Although the truck

was parked for only 5 minutes at most, that was enough for the City.

80. The next day, on February 29, 2024, City Code Enforcer Gomez Cordova arrived at the Church with four City vehicles—two police motorcycles, a City Code Enforcement Specialist truck, and a City Transit Enforcement truck—and was accompanied by a police officer. With this entourage in tow, City Code Enforcer Gomez Cordova cited Pastor Castro with identical code violations. [Ex. J, 02/29/2024 Citation Form.]

81. The City Code Enforcer indicated that the City had heard that a semi-truck was parked in front of the Church the previous day and demanded information about the third-party that owned the truck. However, Pastor Castro refused to say anything or show the bill of lading, out of fear of getting anyone else in trouble with the City.

82. On March 1, 2024, Pastor Castro heard City workers say that he needs to understand that the Food Ministry will be shut down completely.

83. As these two incidents show, the City is now attempting to extract civil and potentially criminal penalties against the Church's pastor for feeding the hungry and having structures on its property that have been in plain sight for decades. That Pastor Castro was cited the second time, for a third-party's mistake, shows an ongoing and increasing pattern of harassment and intimidation against the Church to stop its ministry efforts.

84. The Church and its pastor face a severe financial hardship to pay up to $4,000 in fines stemming from these citations over its Food Ministry infrastructure and deliveries.

85. If the Church's pastor is cited one more time, the penalties will increase significantly, as he could be criminally cited with a Class 1 Misdemeanor, and will face another $2,500 fine, imprisonment for no more than 6 months, or both. SLCC § 18.05.110.

86. These incidents caused great embarrassment and frustration to Pastor Castro.

87. The Church is worried that if another third-party parks in front of the Church by mistake, without invitation from the Church, its pastor may go to jail.

88. But despite these aggressive tactics against the Church, the City does not appear to be treating similarly situated entities in the residential neighborhood equally.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

89.     Within blocks of the Church, 18-wheeler semi-trucks and other commercial vehicles from FedEx, furniture stores, buses, food trucks, a tow truck company, and a local Head Start program are frequently seen parking, loading, and unloading on residential streets and residences—sometimes, for hours or days at a time.






90.     On May 20, 2024, the City itself parked two semi-truck cabs with open trailers in the Church's parking lot for several hours while public contractors carried out maintenance work at the neighboring park.



91.     On information and belief, the City has not threatened or formally taken any enforcement action against any of these similarly situated entities.

**IV.    The City's Selective Enforcement and Intimidation Has Harmed the Church's Ability to Continue Its Ministry.**

92.     Ultimately, the Church's only interest is its ability to exercise its religious beliefs. This includes (1) operating the Food Ministry on its property, as it has done since 1999, and (2) using the semi-truck to load and unload food in its parking lot for the two hours permitted by City Code. The Church is open to working with the City on how to accomplish this.

93.     If the City prevents the Church from operating its Food Ministry on its

property, there is nowhere else it could functionally continue, as the Church does not have the funding or resources to buy another building that would accomplish its religious purposes. Moreover, the City, at the direction of Mayor Riedel, refuses to allow the Church to use any public property, city warehouse, or public park—including the park bordering the Church's property—to engage in its relief efforts and religious exercise.

94. The Church is not subject to a requirement to seek a CUP, as the City has treated it and the Food Ministry as a legal nonconforming use since the City updated its zoning code in 2012.

95. Based on the Church's previous interactions with the Mayor and City Council, applying for a CUP would be a futile and cost prohibitive effort. The City has informed the Church repeatedly that, because it is located in a residential zone, the Church may not distribute food or store food at the Church's location as it has done in the past. And although the Church submitted testimony before the City Council and numerous letters of its own explaining the legal reasons why it is permitted to continue its legal nonconforming use in accordance with the First Amendment and federal and Arizona laws, the City has not changed its position, nor is it likely to do so if the Church were to submit a CUP application. Even if the Church were subject to a requirement to seek a CUP, which it is not, going through the process would take months and be at great expense, only to leave the Church in the same position.

96. The Church does not have sufficient financial resources to seek a CUP and prepare the necessary paperwork and site plans that would be required for the process, nor does it or its pastor have the financial means to pay the pending fines for zoning code violations.

97. As a direct result of the City's actions, between September 2023 and March 3, 2024, the Church had to significantly curtail its Food Ministry. During that time, the Church stopped using necessary infrastructure to easily transport food and supplies, and it has not been able to serve the number of needy that it could before.

98. On March 4, 2024, the Church paused its Food Ministry completely in

response to the second round of zoning citations issued to Pastor Castro the week before. The Church and its pastor cannot afford the mounting fines and possibility of criminal penalties that might incur if it continues its efforts to feed the hungry in the community. As a result, the Church has, at least temporarily, lost one of its primary methods of sharing the Gospel in the City.[3]

99. Since it paused the Food Ministry in March, the Church has lost the opportunity to celebrate multiple holidays by passing out food, toys, and household items to bless the local community on Mothers' Day and International Children's Day.

100. The Church's temporary inability to conduct the Food Ministry, due to the City's citations and threats of legal action, have also caused significant harms in the community. Pastor Castro receives calls and requests nearly every day asking when the Church will provide food again. Other ministries that rely on donations from the Church have had to cut back on their own charitable giving and activities because the Church has been unable to help them.

101. If not for the City's threats of further legal action, the Church would fully reopen the Food Ministry and give with open hands, as it has for 25 years.

102. On one occasion, the Church's staff drove its semi-trucks to a neighboring city of Somerton, Arizona, to meet up with other pastors and give them the food and household supplies that the Church was storing in the trucks.

103. The Church still has some food and supplies in storage that it wishes to share with the community through the Food Ministry.

104. On April 1, 2024, an individual attempted to break into the Church's storage

---

[3] Only after the original complaint in this action was filed, the City stated its position that in exchange for resolving this issue on a summary judgment posture rather than a preliminary injunction, the Church may engage in certain highly limited ministry efforts and the City will support a continuance of the civil citation charges. However, because the City has reserved the right to change its position with 30 days' notice and has not committed to refrain from further citing Pastor Castro, the ministry is barely operating as a shadow of its previous self. Indeed, the City still maintains that central components of the Church's ministry are still unlawful and, though it has delayed its prosecution of the citations, refuses to dismiss the charges pending against Pastor Castro.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

areas where some on-site supplies are kept. He was stopped and processed by police. The individual has previously volunteered at the Church and has often received food from the Food Ministry. Upon information and belief, this individual was attempting to steal food for his family because they are going hungry without the Food Ministry's support.

105. The City's actions have forced the Church to reject donations and tell would-be donors that it cannot accept food and supplies. The Church built these charitable relationships over the course of decades. Its inability to receive donations threatens those relationships, especially with farmers who currently provide the Food Ministry with fresh produce, and may result in permanent loss of donors.

106. These harms not only prevent the Church from feeding the hungry in the City but also interfere with the Church's ability to share the Gospel and follow Jesus' commands.

## FIRST CLAIM FOR RELIEF

### Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc)
### Substantial Burden

107. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

108. Under RLUIPA, the government is prohibited from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government can demonstrate that imposition of the burden on that person, assembly, or institution[] (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

109. RLUIPA specifically applies where "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." *Id.* § 2000cc(a)(2)(C).

110. However, "[n]othing in RLUIPA requires that the individualized assessment

actually take place in order for RLUIPA to apply. It is sufficient that [procedure or practice] 'permits' the City to conduct an individualized assessment in the process of evaluating any permit application." *St. Timothy's Episcopal Church v. City of Brookings*, No. 1:22-cv-00156-CL, 2024 WL 1303123, at *6 (D. Ore. Mar. 27, 2023) (citing 42 U.S.C. § 2000cc(2)(C)). And even if this were not the case, an individualized assessment can still occur when a city issues a written determination that reflects that the city has "tak[en] into account [a church's] particular activities and use of the land to determine compliance with the code." *Id.* at *7.

111.    The Church's RLUIPA claim is ripe because the Church is not subject to any requirement to seek a CUP in the first instance, as the City already determined that the Church and the Food Ministry constitute a legal nonconforming use (and therefore need not apply for a CUP) after the City updated its zoning code in 2012. [*See* Ex. C.] The City's recent attempt to re-classify the Church as "commercial" to trigger the CUP requirement and its categorical prohibition of certain fundamental aspects of the Church's ministry are improper, and itself constitute an RLUIPA violation.

112.    Further, any CUP application would be futile, as the Church cannot afford to comply with the City's unfounded demand that it obtain a CUP. And even if it could, the City's hostility towards the ministry over the last several months illustrates that its application would almost certainly be denied.

113.    RLUIPA's "individualized assessment" requirement is also satisfied because if the Church applied for a CUP, the City would conduct an individualized assessment in the process of evaluating the application. *See St. Timothy's*, 2024 WL 1303123, at *6–7 (holding the church was not required to seek a CUP for RLUIPA to apply so long as the applicable ordinance would permit the city to conduct an individualized assessment during the application process).

114.    Additionally, even if RLUIPA did require that an individualized assessment actually take place, the City has already conducted such an assessment of the Church's Food Ministry. *See id.* at *7. In its letters to the Church, the City said that the Church was

distributing food without a CUP and in violation of various city code provisions. [*See* Exs.
F, H–J.] The City considered the Church's particular activities and use of its own land to
determine compliance with the code in the process of preparing these letters, and has
enforced its decision by issuing citations against Pastor Castro. And even if this were not
enough, the City conducted individualized assessments when it determined that the Church
and Food Ministry were a legal non-conforming use in 2012 and when it determined that
the Church could not utilize its land to load and unload food with semi-trucks in the first
instance in 2023.

115. The City's zoning codes and ordinances constitute land use regulations under
RLUIPA because they restrict the Church's use of its own property. While the City has long
treated the Church and its Food Ministry as a legal nonconforming use, the City has now
improperly invoked numerous provisions of its zoning code in effort to stop the Food
Ministry's food distribution activities at the Church's current location. [*See, e.g.,* Ex. C
(citing SLCC § 18.80.030 Limitation on uses; § 302.1 Sanitation); Ex. D. (citing SLCC §
18.100.030); Ex. H (citing SLCC § 18-25-040(C)(2) and (5)). Additionally, certain
activities that the City is attempting to prohibit (or at a minimum, regulate) are inextricably
tied to fundamental aspects of the Church's use of the property for its Food Ministry, such
as temporarily storing food on the premises, loading and unloading food and supplies from
the semi-truck in its parking lot, and distributing food to the needy in the community.

116. Several courts have expressly recognized that food distribution to the poor
and needy is religious exercise. *See, e.g., Harbor Missionary Church Corp. v. City of San
Buenaventura*, 642 F. App'x 726, 727–29 (9th Cir. 2016) (finding that the church's
homeless ministry, which included offering food, was "an integral part of its religious
exercise"); *W. Presbyterian Church v. Bd. of Zoning Adjustment of D.C.*, 862 F. Supp. 538,
544 (D.D.C. 1994) (recognizing that "acts of charity as an essential part of religious worship
is a central tenet of all major religions," and finding that a church's feeding program was
"religious conduct falling within the protections of the First Amendment and the RFRA");
*St. Timothy's*, 2024 WL 1303123, at *5 ("There can be no genuine dispute that feeding the

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

hungry faithfully upholds one of the most admirable tenants of the Christian religion.").

117.     Moreover, for a burden to be considered "substantial," it "must place more than an inconvenience on religious exercise." *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 985 (9th Cir. 2006) (denial of CUP application constituted a substantial burden under RLUIPA).

118.     By effectively prohibiting the Church from operating its Food Ministry on its property, including by barring the Church from using its property to load and unload semi-trucks in its parking lot in compliance with the City Code, the City is imposing a residential land use restriction against the Church.

119.     The Church's Food Ministry is fundamental to the Church's free exercise and cannot be severed from its other religious practices. *Harbor Missionary Church*, 642 F. App'x at 729 (finding that "[t]he district court erred by questioning the validity of the Church's religious beliefs and by determining that its homeless ministry could be divided piecemeal when the Church insisted on the importance of keeping its homeless ministry as a whole at the same location")

120.     The City's efforts to stop (or at a minimum, substantially inhibit) the Church from conducting its Food Ministry at its current location, when relocation would significantly hinder its ministry efforts, substantially burdens the Church's religious exercise in violation of RLUIPA. *See id.* (the "City's denial of a [CUP] prevents the Church from conducting its homeless ministry at its current location," and the "substantial cost associated with relocating the site of the Church demonstrates that the denial of the [CUP] substantially burdens the Church's religious exercise."); *see also Yellowbear v. Lambert*, 741 F.3d 48, 55–56 (10th Cir. 2014) (Gorsuch, J.) (whenever the government "prevents the plaintiff from participating in [a religious] activity," giving the plaintiff no "degree of choice in the matter," that action "easily" imposes a substantial burden on religious exercise); *United States v. Hoffman*, 436 F. Supp. 3d 1272, 1285 (D. Ariz. 2020) (finding a substantial burden where "enforcement of [] regulations" threatened defendants to "coerce them, via criminal sanctions, into abandoning conduct that is an exercise of religion"

- 22 -

(simplified)); *Micah's Way v. City of Santa Ana*, No. 8:23-cv-00183-KOC-KES, 2023 WL 4680804, at *5 (C.D. Cal. June 8, 2023) (ministry sufficiently pleaded substantial burden under RLUIPA where city threatened administrative fines and legal action unless plaintiff ceased its food distribution ministry).

121.    Specifically, the City has imposed a substantial burden on the Church's religious exercise by improperly classifying the Food Ministry as a "commercial" operation and demanding that it cease and desist unless the Church applies for a CUP.

122.    Similarly, the City has substantially burdened the Food Ministry's operation by categorically prohibiting the Church from utilizing its property to engage in integral parts of its Food Ministry, such as temporarily loading and unloading food and other supplies from its semi-truck for the two hours permitted by City Code. Without these activities, the operation of the Food Ministry has and will continue to be substantially curtailed.

123.    Due to the City's demands, the Church has been forced to halt nearly all operations related to its Food Ministry, which has dramatically reduced the number of people the Church can assist.

124.    As demonstrated by previous support of the Food Ministry over the last 25 years, its treatment as a non-conforming use, and the Church's commitment to abide by all traffic and health and safety requirements, the City has no compelling interest in either prohibiting the ministry outright or substantially curtailing its operations.

125.    Nor does the City have any interest in categorically prohibiting the Church from using its property to load and unload its semi-trucks in compliance with City Code §§ 10.15.250 and -255(D).

126.    And even if the City does have some interest in enforcing its Zoning Code, its efforts are not narrowly tailored, as it has refused to allow the ministry to continue as before even though the Church has moved almost all food storage off its property and agreed to abide by all laws regarding the use of its semi-truck.

127.    This lack of tailoring is especially evident from the City's decision to cite Pastor Castro for distributing emergency food supplies to only ten hungry people.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

128.    As a direct and proximate result of the City's RLUIPA violation, the Church has suffered and will continue to suffer irreparable harm, including the loss of its statutorily protected rights, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

129.    Accordingly, Plaintiff seeks (1) a declaration that Defendant's restrictions on the Church's Food Ministry violate RLUIPA; (2) an order enjoining Defendant from taking any enforcement actions on this basis; and (3) an award of nominal damages.

## SECOND CLAIM FOR RELIEF

**Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc)
Equal Terms**

130.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

131.    Under RLUIPA, the government may not "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  42 U.S.C. § 2000cc(b)(2).

132.    The City's interests in enforcing its zoning ordinances do not grant it a license to treat the Church worse than comparable institutions. Indeed, under RLUIPA's straightforward Equal Terms proscription, the City's motives for treating a religious institution unequally are irrelevant and this Court may not consider them. *See Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1170–71 (9th Cir. 2011). The text of the Equal Terms provision does not provide an interest-balancing test "to see if the government can excuse the equal terms violation." *Id.* at 1171 (simplified); *see also id.* (explaining "we cannot accept the notion that a 'compelling governmental interest' is an exception to the equal terms provision, or that the church has the burden of proving a 'substantial burden' under the equal terms provision"); *River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 389 (7th Cir. 2010) (Sykes, J., dissenting) (explaining that this provision "reflects a congressional judgment about state and local regulation of religious land uses: Regulations that treat religious assemblies or institutions less well than nonreligious assemblies or institutions are inherently not neutral"); *Lighthouse Inst. for*

- 24 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1  *Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007) (Jordan, J., concurring

2  in part and dissenting in part) (centering the RLUIPA Equal Terms inquiry on a city's

3  zoning objectives would give it "a ready tool for rendering [the Equal Terms provision]

4  practically meaningless").

5      133.    Importantly, the "burden is not on the church to show a similarly situated

6  secular assembly, but on the [City] *to show that the treatment received by the church should*

7  *not be deemed unequal*, where it appears to be unequal on the face of the ordinance." *Centro*

8  *Familiar*, 651 F.3d at 1173 (emphasis added). It is sufficient that the City has treated

9  religious institutions and nonreligious institutions on less than equal terms.

10      134.    While the City has employed aggressive tactics, including cease-and-desist

11  letters and even civil and possible criminal citations against the Church's pastor, to stop the

12  use of semi-trucks at the Church for its Food Ministry, upon information and belief, the

13  City turns a blind eye to the use of 18-wheeler semi-trucks or other commercial vehicles for

14  hours (and even days) at a time at nearby nonreligious entities, including FedEx, furniture

15  stores, buses, food trucks, a tow truck company, and a local Head Start program.

16      135.    The City's application of its ordinances violates RLUIPA because it treats the

17  Church on less than equal terms compared to comparable nonreligious charitable programs

18  and similarly situated for-profit commercial enterprises located just blocks away within the

19  same zone.

20      136.    As a direct and proximate result of the City's RLUIPA violation, the Church

21  has suffered and will continue to suffer irreparable harm, including the loss of its statutorily

22  protected rights, entitling it to declaratory and injunctive relief, nominal damages, and

23  attorneys' fees.

24      137.    Accordingly, Plaintiff seeks (1) a declaration that Defendant's restrictions on

25  the Church's Food Ministry violate RLUIPA; (2) an order enjoining Defendant from taking

26  any enforcement actions on this basis; and (3) an award of nominal damages.

27

28

# THIRD CLAIM FOR RELIEF

## Free Exercise of Religion, U.S. Const. amend. I and XIV
### 42 U.S.C. § 1983

138. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

139. The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, "withdraws from [governmental] power . . . the exertion of any restraint on the free exercise of religion." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222–23 (1963). The purpose of this clause "is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Id.*

140. The Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of religious beliefs." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

141. "General applicability requires, among other things, that the laws be enforced evenhandedly." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). But a "law is not 'generally applicable' if the law 'impose[s] burdens only on conduct motivated by religious belief' in a 'selective manner.'" *Apache Stronghold v. United States*, 38 F.4th 742, 770 (9th Cir. 2022) (vacated on other grounds) (quoting *Lukumi*, 508 U.S. at 533, 543).

142. The "government may not 'treat *any* comparable secular activity more favorably than religious exercise" without violating these well-established principles. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) ("*FCA*") (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)).

143. The Free Exercise Clause also protects against government actions that are coupled with "official expressions of hostility to religion," whether subtle or overt. *FCA*, 82 F.4th at 690 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 639 (2018)).

144. As such, any governmental practice "burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny" in which the government must advance "interests of the highest order" that are "narrowly tailored"

to those interests. *Lukumi*, 508 U.S. at 546.[4]

145.   It is the City's policy and practice that charitable food distribution is a commercial enterprise and thus a church may not operate a legal nonconforming food ministry in a residential district without a CUP. It is also the City's policy that semi-trucks are not permitted in residential areas. These policies were articulated to the Church through the multiple notices and cease-and-desist letters by City officials with the authority to represent and execute City policy, including the Mayor and City Manager, and are demonstrated by the various citations against Pastor Castro by the City's Code Enforcement Officer. *Shelley v. Cnty. of San Joaquin*, 996 F. Supp. 2d 921, 932 (E.D. Cal. 2014) ("[A] single decision may satisfy *Monell*'s municipal policy requirement if that decision was properly made by one of the municipality's authorized decision makers, *i.e.*, by an official who possesses final authority to establish a municipal policy with respect to the challenged action." (quotations omitted)).

146.   Under the auspices of the City's policies and practices, the City violated the Church's Free Exercise rights by improperly implementing and executing the City Code in a manner that prevents the Church from conducting its ministry activities at the Church's own property. The City and its officials, although acting under color of law, are abusing the City Code in an attempt to prohibit the Church from exercising its sincerely held religious beliefs—to feed the hungry through its Food Ministry.

147.   At first blush, the City's reference to its Zoning Code suggest that they are merely attempting to enforce laws of general applicability.

148.   However, the City's misapplication of these laws against the Church— including its improper classification of the Church's operations as "commercial" and its refusal to permit the Church to operate its semi-trucks even within the bounds of City

---

[4] Unlike RLUIPA, a Free Exercise claim does not require proving that a government's actions *substantially* burden a plaintiff's religious exercise. Instead, a plaintiff need only establish that "a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *see also Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (stating "the sincerity test . . . determines whether the Free Exercise Clause applies").

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Code—demonstrate that their actions are anything but.

149. This is especially true when the government has not applied similar enforcement against the use of semi-trucks and other commercial vehicles, including those delivering food, by similarly situated secular entities in the area. *Supra* ¶ 89.

150. Likewise, the City's improper attempt to characterize a normal religious practice, like charitably giving to a religious ministry, as "commercial activity" substantially burdens the Church's free exercise of religion.

151. The City has also exhibited unsolicited hostility against Pastor Castro and the Church. For instance, rather than working cooperatively to find a solution to their alleged concerns, the City has resorted to targeted intimidation efforts in an effort to shut down the Church's religious practice—including by baselessly citing Pastor Castro for simply passing out food to the poor.

152. At the Mayor's direction, the City has denied the Church access to a City-owned warehouse, to which the Church had previously enjoyed government-granted access to store donations and food for the Food Ministry.

153. The Mayor also unsuccessfully attempted to veto a grant that the City wished to give to the Church, like it had done for years before, and she has overseen and directed efforts to stop the Food Ministry's operations.

154. The Acting City Manager and City Code Enforcer have both taken direct steps to stop the Food Ministry from operating on the Church's property by sending notices and cease-and-desist letters, and most recently, by repeatedly issuing citations to the Church's pastor for activities and on-site structures related to the Food Ministry.

155. The City is not constitutionally permitted to suppress the Church's religious exercise in this manner. *See Micah's Way*, 2023 WL 4680804, at *6 (food ministry plausibly pled violation of the Free Exercise Clause by a municipality where the city selectively enforced its zoning code against the ministry and where individual city employees targeted the ministry for enforcement). Again, the City has no interest in prohibiting the Food Ministry, and its enforcement actions are not narrowly tailored.

156.     This claim is also ripe for review because, as discussed above, (1) the Church need not obtain a CUP to operate the Food Ministry in the first instance, and (2) the City has already made an individualized determination as to the Food Ministry's operation.

157.     As a direct and proximate result of the City's constitutional violation, the Church has suffered and will continue to suffer irreparable harm, entitling it to declaratory and injunctive relief, nominal damages, and attorneys' fees.

158.     Accordingly, Plaintiff seeks (1) a declaration that Defendant's restrictions on the Church's Food Ministry violate the Church's free exercise of religion under the First and Fourteenth Amendments; (2) an order enjoining Defendant from taking any enforcement actions on this basis; and (3) an award of nominal damages.

## FOURTH CLAIM FOR RELIEF

### Substantial Burden under Arizona Free Exercise of Religion Act
### (A.R.S. 41-1493 *et seq.*)

159.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

160.     FERA declares that the "[f]ree exercise of religion is a fundamental right that applies in this state even if laws, rules or other government actions are facially neutral." A.R.S. § 41-1493.01(A).

161.     To bring a FERA claim, the plaintiff "must prove that: (1) [its] action or refusal to act is motivated by a religious belief, (2) the religious belief is sincerely held, and (3) the government's regulation substantially burdens the free exercise of [its] religious beliefs." *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 297 ¶ 127 (2019); *see also* A.R.S. §§ 41-1493(2), -1493.01(B). The burden then "shifts to the government to show that the law (1) furthers a compelling governmental interest and (2) is the "least restrictive means of furthering that compelling governmental interest." *Brush & Nib*, 247 Ariz. at 297–98 ¶ 127; A.R.S. § 41-1493.01(B).

162.     "Under the least restrictive means test, the government must "show[ ] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Brush & Nib*, 247 Ariz. at 302 ¶ 149 (citing

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

163.    And even if the government can demonstrate a compelling interest, it "shall not impose or implement a land use regulation in a manner that imposes an unreasonable burden on a person's exercise of religion," unless it demonstrates either:

    a.  "That the person's exercise of religion at a particular location violates religion-neutral zoning standards enacted into the government's laws at the time of the person's application for a permit,"

    b.  "That the person's exercise of religion at a particular location would be hazardous due to toxic uses in adjacent properties," or

    c.  "The existence of a suitable alternate property the person could use for the exercise of religion." A.R.S. § 41-1493.03

164.    Once again, the City's efforts to shut down the Church's Food Ministry by improperly classifying it as a "commercial" entity, as well as its misapplication of the City Code to prohibit the Church from using its semi-trucks to transport food, constitutes implementation of a land use regulation in a manner that substantially burdens the Church's sincerely held religious beliefs.

165.    Because of the City's demands and enforcement actions, the Church has been forced to cease almost all food distribution efforts. Indeed, Pastor Castro cannot even serve ten people on Church property without receiving a citation.

166.    And again, the City has no compelling interest in shutting down the ministry entirely, nor can it show that there are no other means of enforcing the Zoning Code while still allowing the Church to maintain its ministry.

167.    Even if the City did have a compelling interest, it cannot demonstrate (1) that the Church has violated any zoning laws that were in place when the Church began the Food Ministry in 1999, (2) that any of the Church's activities are hazardous, or (3) that there is another financially feasible property to conduct the Food Ministry.

168.    Accordingly, Plaintiff seeks (1) a declaration that Defendant's restrictions on the Church's Food Ministry constitute a substantial burden in violation of FERA, and (2) an order enjoining Defendant from taking any enforcement actions on this basis.

- 30 -

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

# FIFTH CLAIM FOR RELIEF

## Unequal Treatment under Arizona Free Exercise of Religion Act
### (A.R.S. 41-1493 *et seq.*)

169.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

170.    FERA provides that the "[g]overnment shall not impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, regardless of a compelling governmental interest." A.R.S. § 41-1493.03(B).

171.    Despite imposing substantial burdens on the Church's activities, and specifically its use of semi-trucks to facilitate the Food Ministry's operations, the City has shown little interest in applying the rules to anyone else.

172.    Indeed, over the last several months, the City has permitted 18-wheeler semi-trucks and other commercial vehicles to park, load, and unload in the residential zone— including at the local Head Start program only a couple of blocks away from the Church. *Supra* ¶ 89.

173.    Applying the Zoning Code to the Church without imposing the same requirements on nonreligious properties in the same zone is certainly not treating the two on equal terms.

174.    Accordingly, Plaintiff seeks (1) a declaration that Defendant's restrictions on the Church's Food Ministry constitute unequal treatment in violation of FERA, and (2) an order enjoining Defendant from taking any enforcement actions on this basis.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A declaration pursuant to 28 U.S.C. §§ 2201–02, Federal Rule of Civil Procedure 57, A.R.S. § 12-1831, and other applicable law that Defendant's restrictions on the Church's Food Ministry violate Plaintiff's rights under RLUIPA and the First and Fourteenth Amendments of the U.S. Constitution and constitute a substantial burden and unequal treatment in violation of FERA.

B.  An injunction pursuant to 28 U.S.C. § 2202, Federal Rule of Civil Procedure 65, A.R.S. § 12-1801, Arizona Rule of Civil Procedure 65, and other applicable law preliminarily and permanently enjoining Defendant from taking any enforcement action against the Church for operating the Food Ministry or lawfully loading and unloading semi-trucks on its property;

C.  An award of nominal damages for all federal claims under 28 U.S.C. § 1343;

D.  An order awarding Plaintiff's attorney's fees and nontaxable expenses incurred in this action under 42 U.S.C. § 1988, A.R.S. § 41-1493.01(D), and any other applicable law; and

E.  Such other relief as the Court deems necessary, equitable, proper, and just.

## JURY TRIAL DEMAND

The Church demands a jury trial on all issues so triable.

DATED this 4th day of June, 2024.

SNELL & WILMER L.L.P.

By: /s/ Ryan J. Regula
Ryan J. Regula
Charlene A. Warner
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070

David J. Hacker (*pro hac vice*)
Jeremiah G. Dys (*pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: 972.941.4444
dhacker@firstliberty.org
jdys@firstliberty.org

Camille P. Varone (*pro hac vice*)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Avenue, N.W.
Suite 1410
Washington, D.C. 20004
Telephone: 202.921.4105
cvarone@firstliberty.org

Steven D. Keist
KEIST THURSTON O'BRIEN
10150 W. Desert River Blvd.
Glendale, Arizona 85037
Telephone: (623) 937-8888
steve@ktolawfirm.com

*Attorneys for Plaintiff Gethsemani Baptist Church*

## **VERIFICATION**

I, Jose Manuel Castro, have reviewed the foregoing First Amended Verified Complaint and verify under penalty of perjury that it is true and correct.

Dated: June __1__, 2024



Jose Manuel Castro
Pastor, Gethsemani Baptist Church

JOVANNA NAVA
Notary Public, State of Arizona
Yuma County
Commission # 643202
My Commission Expires
January 17, 2027

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1  **<u>CERTIFICATE OF SERVICE</u>**

2
3      I hereby certify that on this 4th day of June 2024, I electronically transmitted the

attached document to the Clerk's Office using the CM/ECF System for filing and transmittal

4   of a Notice of Electronic Filing to all CM/ECF Registrants.

5

6   s/ Tracy Hobbs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28