WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gethsemani Baptist Church,<br><br>        Plaintiff,<br><br>v.<br><br>City of San Luis, et al.,<br><br>        Defendant. | No. CV-24-00534-PHX-GMS<br><br>**ORDER** |

Pending before this Court is Defendant's Motion to Dismiss. (Doc. 35). The Court heard oral argument on the Motion on November 14, 2024. For the reasons below, the Court denies Defendant's Motion to Dismiss.

## BACKGROUND

### I.     The B Street Property

Plaintiff Gethsemani Baptist Church ("Church"), under the leadership of Pastor Jose Manuel Castro, has operated Gethsemani Food Ministry at 1010 B Street, San Luis, AZ 85349 ("B Street property") since 1999. (Doc. 34 at 2-4). Throughout the week, the Food Ministry distributes food, clothing, water, and other household supplies to people in need. (*Id.* at 4). The Ministry also serves about 300 families every Saturday morning. (*Id.*). While the Ministry has never required reimbursement for charitable food or goods, many beneficiaries donate a small amount upon receipt of goods. (*Id.* at 6). The Ministry is not a commercial enterprise and does not operate for profit. (*Id.*).

For the first 14 years of operation, the Church stored most of its food and supplies at a warehouse owned by the City of San Luis ("City"). (*Id*.). Beginning in 2002, the Church used two semi-trucks to transfer food to its B Street property to facilitate distribution efforts. (*Id*. at 6). The Church is situated between two streets, with B Street on the south side of the property and Babbitt Lane running parallel to B Street on the north side of the property. To deliver the food, the trucks would turn into the property from B Street, unload the food in the paved parking lot in front of the Church, and then depart on Babbitt Lane. (*Id*.). The truck would never unload or park on the residential streets surrounding the B Street property. (*Id*. at 7). Food dropped off would be donated or taken back to the warehouse at the end of the day. (*Id*. at 7). The two semi-trucks, as well as smaller box trucks with trailers owned by the Church, are stored half a mile from the Church in a business complex. (Id. at 8).

In 2012, the City adopted its current Zoning Code and designated the Church and Ministry as a "legal nonconforming use." (*Id*.). This designation allowed the Church and Ministry to continue operating its pre-established services and food distribution at the B Street property pursuant to Zoning Code § 18.100.030, which provides that a "legal nonconforming use may continue only in the manner and to the extent that it existed at the time of such enactment, amendment, or annexation." (*Id*.). Since the "legal nonconforming use" designation in 2012, the Ministry asserts that it has not "dramatically changed" in scope or character." (*Id*.).

**City's Advisement of Zoning Code Violations**

In 2022, newly elected Mayor Nieves Reidel cut ties between the Ministry and the City, and the Church removed its food and supplies from the City warehouse. (*Id.* at 9). On September 11, 2023, Acting City Manager Jenny Torres, at the Mayor's direction, sent Pastor Castro a letter "informing the Church of the City's policy that 'per city code semi-trucks are not permitted in residential areas,' and that the City would 'commence enforcement at the church of the no semi-trucks in the residential neighborhood.'" (*Id.*). The following three code provisions were included in the letter:

§ 10.15.245, which provides that "[u]pon any street outside of a business or residence district, no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the roadway when it is practicable to stop, park or so leave the vehicle off that part of the roadway."

§ 10.15.250, which provides that "[n]o person shall stand or park a vehicle with a rated chassis capacity in excess of three-fourths of a ton or a tractor, semitrailer, trailer or bus on a local street in a residential area except during the process of loading or unloading the vehicle.

§ 10.15.255, which provides in relevant part that (A) "[t]he parking of any commercial vehicle of more than one-and-one-half-tons' capacity on any lot in any residential area shall be considered a commercial use and is prohibited," and that (D) "[n]o person shall stop, stand, park or store a disabled vehicle or vehicles, or a trailer or a trailer loaded with a vehicle, on any street, alley or right-of-way in any residential or commercial area of the City for a period of more than two hours." (*Id*.).

The Church responded to the City stating that, to the extent it used its parking lot to load and unload the trucks, the Church agreed to keep those efforts under two hours, as permitted by City Code §§ 10.15.250, -255(D). (*Id*.). Further, to avoid police enforcement in the short term, the Church also began unloading the semi-trucks at a location off property and using a small trailer to ferry food and supplies to the Ministry. (*Id*. at 10). The Church did not concede and still believes that its previous actions were in adherence with City Code. (*Id.*).

On September 29, 2023, the City Planning and Zoning Commission, through City Code Enforcer Alexis Gomez Cordova, sent a Notice of Zoning Violation to the Church. (*Id.*). The Notice stated that the Ministry itself violated the City's zoning code. (*Id.*). The City acknowledged that, starting in 2012, it considered the Church and its Food Ministry to be a "legal non-conforming use" pursuant to SLCC § 18.100.030. (Doc. 34-1 at 10). However, the City explained that the "distribution, storage, and traffic generated by the food distribution activity clearly alter the nature and character of the non-conforming use, constituting an illegal change to the non-conforming use.'" (*Id.*). The City advised Pastor Castro that the operation of the "food distribution business is not considered a pre-existing

non-conforming use . . . and is in violation of the City of San Luis Zoning Code." (*Id.*). Thus, the City concluded that the Church needed to "rectify the violations" within 30 days by "ceasing all commercial level food storage or distribution." (*Id.* at 11). Mayor Riedel sent a letter on October 4, 2023, in which she reiterated that food distribution at the Ministry violated the City's zoning code and that food distribution is permitted only in a commercial or industrial zoning district. (Doc. 34 at 11).

The Church responded to the City in a letter on November 2, 2023, informing the City that its "actions were unconstitutional, and that the City had misapplied its Code against the Church regarding the use of semi-trucks." (*Id.*). Yet, via a letter on November 7, 2023, the City asserted that the Ministry constituted "commercial food, storage, preparation, or distribution," had increased distribution activities in both nature and intensity, and could therefore not operate without a Conditional Use Permit ("CUP") under Code § 18.100.030. (*Id.* at 11-12; Doc. 34-2 at 3-4). The Church disputed many of the material facts the City relied upon in its letter and offered to stop requesting small donations "to remove any misconceptions that the Food Ministry was a commercial effort." (Doc. 34 at 12). Yet, the City sent another letter on December 7, 2023, accusing the Church of "routinely operating vehicles in a way that violates numerous provisions of the San Luis City Code and the laws of the State of Arizona." (*Id.* at 13; Doc. 34-2 at 15). The City continues to assert the Church has engaged in "commercial level food distribution" that requires a CUP. (Doc. 34 at 13).

**II.    City's Enforcement of Zoning Code**

On February 22, 2024, City Code Enforcer Alexis Gomez Cordova entered the Church property and issued four citations against Pastor Castro for "(1) unspecified 'use of property . . . not permitted in' a residential zone under City Code § 18.05.110(A), and (2) 'construction' of an enclosing wall, shade structure, and walk-in cooler 'without a building permit' under City Code § 15.10.990(A)." (*Id.*). The Church asserts that the structures at issued were all built by the Church nearly 30 years ago. (*Id.*).

A week later, on February 29, 2024, City Code Enforcer Gomez Cordova cited

1  Pastor Castro with identical code violations. (*Id.* at 14). The day prior, one of the
2  Ministry's trucks accidently came to the B Street property's parking lot to deliver supplies;
3  Pastor Castro immediately ran outside and asked the driver to leave. (*Id.* at 13). But the
4  City had heard about the incident and cited Pastor Castro for the alleged infraction. (*Id*. at
5  14).
6      As a result of the citations, the Church and Pastor Castro owe up to $4,000 in fines.
7  (*Id*.). If Pastor Castro receives another citation, penalties will increase—he could be
8  criminally cited with a Class 1 Misdemeanor, may face another $2,500 fine, and be subject
9  to imprisonment for no more than six months. (*Id*.) (citing SLCC § 18.05.110).
10     The Church asserts that the City has not treated similarly situated entities in the
11 residential neighborhood equally. (*Id*.). The Church states that "18-wheeler semi-trucks
12 and other commercial vehicles from FedEx, furniture stores, buses, food trucks, a tow truck
13 company, and a local Head Start program are frequently seen parking, loading, and
14 unloading on residential streets and residents—sometimes, for hours a day." (*Id*. at 15).
15 The Church is not aware of an instance in which the City threatened or formally took any
16 enforcement action against these entities. (*Id.*).
17 **III.  Plaintiff's Claims**
18     Plaintiff brings three federal claims. In Counts One and Two, Plaintiff alleges the
19 City violated the Religious Land Use and Institutionalized Persons Act (RLUIPA) by
20 imposing a substantial burden on the Church's activities under 42 U.S.C. § 2000cc(a)(1)
21 and by treating the Church on less than equal terms under 42 U.S.C. § cc(b)(2). (Doc 34
22 at 19, 24). In Count Three, Plaintiff brings a § 1983 claim and alleges the City violated the
23 Free Exercise Clause of the First Amendment. (Doc. 34 at 26). The City moves to dismiss
24 the Amended Complaint for lack of subject matter jurisdiction and failure to state a claim
25 under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). For the reasons set forth below, the Court
26 denies the Motion to Dismiss all three federal claims.
27     In addition to the federal claims, Plaintiff alleges claims under Arizona's free
28 exercise of religion and land use regulation statute, A.R.S. § 41-1493.03. The Court does

not have sufficient evidence to dismiss these claims and, as such, denies the Motion to Dismiss the state law claims without prejudice.

## STANDARDS OF REVIEW

### I. Motion to Dismiss Legal Standards

#### a. 12(b)(1) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) requires the Court to dismiss an action if the Court lacks subject matter jurisdiction over the suit. Fed. R. Civ. P. 12(b)(1). When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court takes as true the material facts alleged in the complaint. *See Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005). The Court may also consider affidavits or any other evidence necessary to resolve any factual disputes concerning the existence of jurisdiction. *Colwell v. Dep't of Health and Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009). If a defendant attacks the existence of subject-matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction exists. *Thornhill Pub. Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

#### b. 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) requires the Court to dismiss an action if the Plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal for failure to state a claim pursuant to 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When analyzing a complaint for failure to state a claim, "allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations do not receive a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). "Determining whether a complaint states a plausible claim for

relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## DISCUSSION

### I. RLUIPA Claims (Counts One and Two)

The City moves to dismiss the Church's RLUIPA claims on ripeness grounds. (Doc. 35 at 6-7). Standing and ripeness under Article III are closely related: standing is concerned with who the proper litigant is, and ripeness is concerned with when that litigation may occur. *Colwell v. Dep't of Health and Hum. Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009). "Ripeness doctrine prevents courts, through avoidance of premature adjudication, from entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties." *18 Unnamed John Smith Prisoners v. Meese*, 871 F.2d 881, 883 (9th Cir. 1989). There are both constitutional and prudential considerations when determining whether a case is ripe, as "ripeness doctrine is drawn from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* (internal quotations omitted) (citing *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). The constitutional consideration is "rooted in the 'case or controversy' requirement of Article III," whereas the prudential consideration "focuses on whether the record is adequate to ensure effective review." *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1171 (9th Cir. 2001).

While the City's Motion asserted that the Church's claim was not ripe pursuant to prudential considerations, at oral argument the City also asserted that the lack of ripeness in this case is a jurisdictional failing. Neither argument has merit.

The City asserts this Court lacks jurisdiction over the RLUIPA claims because, pursuant to *Guatay Christian Fellowship v. Cnty. of San Digo*, 670 F.3d 957, 980 (9th Cir. 2011), they are not ripe for review. (Doc. 35 at 6-7). Specifically, the City argues that the Church must apply for a Conditional Use Permit ("CUP") before it can assert a RLUIPA claim under 9th Circuit precedent and to establish RLUIPA's jurisdictional element under 42 U.S.C. § 2000cc(a)(2). (*Id.*). Otherwise, the City claims, it has not rendered a final

1 decision on whether or not it will allow what it alleges to be the Church's commercial activity in a residential area as required by *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172 (1985). But, because the facts in this case are significantly different from the facts in *Guatay,* in making their ripeness argument the City misidentifies the final decision the City has already made.

In *Guatay,* a religious congregation began using a recreational building on its property as a chapel. 670 F.3d at 962. The use was not in compliance with the county's rural residential zoning, but, importantly, permission for such use could be obtained if the county issued a conditional land use permit, which the County had the discretion to grant. *Id.* at 960, 964. The congregation had no such permit, nor any other legal status to use the recreational building as a chapel, such as designation of the chapel as a non-conforming use. *Id.* at 964. Nevertheless, the congregation continued to use the recreational building as a chapel for 20 years without any legal status by which it could do so. *Id.* The county eventually issued a notice of violation and cease-and-desist letters to the church and indicated to it that it had to cease using the recreational building as a chapel absent a modification of use permit. *Id.* Rather than apply for a use permit, the Church filed a RLUIPA suit.

The Ninth Circuit held that the suit was not yet ripe as a prudential matter because, even though the use was not authorized by the zoning code, there was a way in which the Church could obtain authorization for its use—that is by applying for a conditional use permit. *Id.* at 981. Since the church had not yet done this, the *Guatay* court found that the suit was not yet ripe as a prudential matter until it attempted to do so and was denied. *Id.* In this case, however, as opposed to *Guatay,* the Church has the legal right to continue to conduct its ministry so long as it does so to the same extent and in the same manner as it did in 2012. The Church maintains that it is doing so, and thus continues to hold the right to operate its ministry as a recognized non-conforming use. The City, however, has informed the Church that it is no longer a non-conforming use and has fined and threatened further fines, including criminal prosecutions, if the Church does not cease its ministry

operations. In purporting to terminate the Church's right to operate its ministry pursuant to the Church's non-conforming use designation, the City has made the relevant final decision. The City makes no argument that its determination that the Church's ministry is no longer a non-conforming use is not final. The City, however, argues that because the Church's designation as a non-conforming use no longer applies, the City must apply for a conditional use permit prior to the City making a final decision on the issue. This is simply wrong. Unlike the case in *Guatay*, the Church has a plausible claim that it maintains the legal right to continue operating its ministry pursuant to its non-conforming use status. It is the final decision of the City to revoke the non-conforming use status that provides the necessary ripeness. To make its claim that it has the existing right to operate its ministry under its currently existing designation as a non-conforming use, the Church need not apply for a new and separate legal right to operate its ministry for this suit to be ripe for decision. Such a requirement would be contrary to basic logic. Neither *Guatay*, nor any other case cited by the City, suggests to the contrary.

Finally, and in any event, in 2021, the Supreme Court modified the finality rule upon which the Ninth Circuit decided *Guatay*, such that the *Williamson County* final determination rule is relaxed. *See Pakdel v. City and Cnty. of S.F., Cal.*, 594 U.S. 474, 478 (2021). In *Pakdel*, the Supreme Court reviewed a Ninth Circuit panel's conclusion that a takings claim was unripe under the final decision rule because, despite twice being denied an exception by the city, the petitioners did not timely request the exception through the prescribed procedures. *Id.* at 477. "In other words, [the Ninth Circuit held that] a conclusive decision is not really 'final' if the plaintiff did not give the agency the 'opportunity to exercise its flexibility or discretion in reaching the decision." *Id.* at 478. The Supreme Court, in review, held this view of finality to be incorrect. *Id.* Instead, it held that the "finality requirement is relatively modest. All a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question." *Id*. Thus, the question for this Court in determining whether Plaintiff's claim is ripe is whether there is any uncertainty about how the City Code applies to the Church's

B Street property. *See id.*

Taking the Church's allegations as true, there is no question about how the City applied it's code to the Church. In a letter to Pastor Castor dated September 29, 2023, the City asserted that "[t]he distribution, storage, and traffic generated by the food distribution activity clearly alter the nature and character of the non-conforming use, constituting an illegal change to a non-conforming use." (Doc. 34-1 at 10). The City advised Pastor Castor that "the operation of a food distribution business is not considered a pre-existing non-conforming use at the premises located at 1010 E. B Street and is in violation of the City of San Luis Zoning Code." (*Id.* at 10). The letter's stated purpose was to "inform [Pastor Castro] that [his] property is in violation of City Code." (*Id.* at 11).

On February 22, 2024, City Code Enforcer Alexis Gomez Cordova entered the Church property and issued four citations against Pastor Castro for "(1) unspecified 'use of property . . . not permitted in' a residential zone under City Code § 18.05.110(A), and (2) 'construction' of an enclosing wall, shade structure, and walk-in cooler 'without a building permit' under City Code § 15.10.990(A)." (Doc. 34 at 13). The Church asserts that the structures at issued were all built by the Church nearly 30 years ago. (*Id.*). A week later, on February 29, 2024, City Code Enforcer Gomez Cordova cited Pastor Castro with identical code violations. (*Id.* at 14). The day prior, one of the Ministry's trucks accidently came to the B Street property's parking lot to deliver supplies; Pastor Castro immediately ran outside and asked the driver to leave. (*Id.* at 13). But the City had heard about the incident and cited Pastor Castro for the alleged infraction. (*Id.* at 14).

As a result of the citations, the Church and Pastor Castro owe up to $4,000 in fines. (*Id.*). If Pastor Castro receives another citation, penalties will increase—he could be criminally cited with a Class 1 Misdemeanor, may face another $2,500 fine, and be subject to imprisonment for no more than six months. (*Id.*) (citing SLCC § 18.05.110).

In bringing its lawsuit, the Church has alleged a well and specifically defined case and controversy that alleges both a real dispute between real parties and the concrete factual setting necessary to satisfy both jurisdictional and prudential ripeness. Thus, whether

considered pursuant to Fed. R. Civ. P. 12(b)(1) or 12(b)(6), the City's Motion to Dismiss Counts One and Two fails.

### a. RLUIPA's Jurisdictional Prerequisite

The "substantial burdens" provision of RLUIPA applies in any case in which "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(2)(C). Courts determine whether the government conducted an "individualized assessment of the proposed uses for the property" before moving onto the merits of substantial burden RLUIPA claims. *Guru Nanak Sikh Society of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 986 (9th Cir. 2006) ("Before we apply the terms of RLUIPA, of course, we first must determine if RLUIPA even applies, by examining whether the actions of the County are 'individualized assessments of the proposed uses for the property involved.'") (quoting 42 U.S.C. § 2000cc(2)(C)).

For the same reasons set forth above, the Church adequately pleads the City made an individualized assessment. To support its allegation, the Church points to the letters the City wrote to the Church, in which the City "considered the Church's particular activities and use of its own land to determine compliance with the code . . . and has enforced its decision by issuing citations against Pastor Castro." (Doc. 34 at 21). Further, the Church argues that the "City conducted individualized assessments when it determined that the Church and Food Ministry were a legal non-conforming use in 2012 and when it determined that the Church could not utilize its land to load and unload food with semi-trucks in the first instance in 2023." (*Id.*). The Church sufficiently pleads facts which, when taken as true, support its claim that the City engaged in an individualized assessment of the Church's use of its B Street property and that entitle the Church to relief. *See Roberts*, 812 F.2d at 1177.

As such, the Court denies the City's Motion to Dismiss on RLUIPA jurisdictional

grounds.

## II. § 1983 Claim (Count Three)

The City moves to dismiss the Church's First Amendment claim, arguing that the Church's claim is not ripe and that the Church fails to allege a plausible violation of the First Amendment. (Doc. 35 at 12). The Court denies the City's Motion to Dismiss the Church's § 1983 claim on both grounds.

### a. Ripeness

The City asserts that, like the RLUIPA claims, "the § 1983 claim is unripe due to the Church's failure to seek a CUP." (Doc. 35 at 12). For the same reasons ripeness was not a ground for dismissal on the Count One RLUIPA claim, it is not a ground for dismissal here.

The Ninth Circuit has not decided whether the final decision requirement from *Williamson County* should apply to First Amendment claims in the land use context. *Guatay*, 670 F.3d at 987. However, the *Guatay* court acknowledged that of the circuits to address this issue, all "have applied the final decision requirement to RLUIPA claims, as well as to related First Amendment-based § 1983 claims when they were presented." *Id.* at 979 (citing *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 353 (2nd Cir. 2005); *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010); *Grace Cnty. Church v. Lenox Twp.*, 544 F.3d 609, 616 (6th Cir. 2008); *Congregation Anshei Roosevelt v. Plan. & Zoning Bd. of the Borough of Roosevelt*, 338 Fed. Appx. 214, 217 (3d Cir. 2009)). Thus, there is strong authority to support this Court's finding that the final decision requirement applies to First Amendment claims.

Recognizing that ripeness turns on whether the City issued a final decision, the Church sufficiently alleges that the City made a final decision by designating the Ministry as "commercial" and issuing escalating fines against the Church and its ministry. As such, dismissal is not appropriate.

### b. Lack of Plausibility

The City also fails in its Motion to Dismiss the Church's § 1983 claim for lack of

plausibility.

In single incident cases, where a municipal employee "applies a facially permissible policy in an unconstitutional matter," the Ninth Circuit requires the plaintiff establish "the final policymaker acted with deliberate indifference to the subordinate's constitutional violations." *Doe v. City of San Diego*, 35 F.Supp.3d 1233, 1238 (S.D. Cal. 2014) (citing *Christie v. Iopa*, 176 F.3d 1231, 1240 (9th Cir. 1999). "To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002). Plaintiff must "plausibly suggest an entitlement to relief," taking all factual allegations as true. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 361, 637 (9th Cir. 2012).

The Church alleges that "the City acted with deliberate indifference to its obligations to the Church under the First Amendment . . . by misapplying City Code and improperly deeming the Church's ministry to be commercial, thereby halting operations unless [the Church] applies for a CUP." (Doc. 38 at 15). The Church pleads facts sufficient to state a claim under a theory of municipal liability.

The Church asserts that it put the City on notice that its misapplication of Code against the Church was unconstitutional. (Doc. 38 at 15; Doc. 34 at 11). Specifically, following the City's October 4, 2023 letter to the Church, in which Mayor Riedel "reiterated the City's policy and practice[] that food distribution on the Church's property violated the City's zoning code," the Church responded in a letter informing the City that it had misapplied its Code against the Church and that the City's actions were unconstitutional. (Doc. 34 at 11). However, despite this letter, the Church alleges that the City continued to insist that the Ministry was "commercial food storage, preparation, or distribution" and that "the Church could not operate the Food Ministry without a CUP." (Doc. 34 at 11-12). The City sent another letter on December 7, 2023, which reiterated that the Church was engaged in commercial operations." (Doc. 34 at 13). "Because of the City's threats, the Church ceased almost all Food Ministry effort." (*Id.*). Still, the Church

alleges that the City continued to enforce its Code, despite the Church notifying the City that its enforcement was an error and in violation of the Church's constitutional rights, ultimately resulting in the pausing of the Ministry's work entirely. (Doc. 34 at 17).

The Church sufficiently plead facts to establish a plausible entitlement to relief. *See AE ex rel. Hernandez*, 666 F.3d at 637. The Church notified the City that continued enforcement of the zoning regulations in error would violate its constitutional rights. Thus, the Church sufficiently alleges that the municipality was on "actual or constructive notice" that its continued, allegedly erroneous enforcement of City Ordinances may violate the Church's constitutional rights. *C.f. Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010) ("[Plaintiffs] failed to adduce evidence that the County was on actual or constructive notice of a problem . . . [because] there was no evidence that . . . the County was aware of and acquiesced in a pattern of constitutional violations."). The Church sufficiently pleads that, despite the notice, the City continued to enforce its Code, which, taking the Church's allegations as true, have been enforced wrongfully and resulted in the violation of the Free Exercise Clause—the Church's right to operate its Ministry in furtherance of its faith.

For this reason, the Court denies the City's Motion to Dismiss Count Three.

### III.    State Law FERA Claims (Counts Four and Five)

The Arizona legislature passed the Free Exercise of Religion Act ("FERA") "to protect Arizona citizens' right to exercise their religious beliefs free from undue governmental interference." *State v. Hardesty*, 222 Ariz. 363, 365 (2009) (*en banc*). "FERA parallels RFRA." *Id.* In fact, Arizona courts "rely on cases interpreting RFRA as persuasive authority in construing the requirements of FERA." *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269 (2019).

The Church brings two claims under FERA: a substantial burden claim and an unequal treatment claim. The City moves to dismiss both of the Church's FERA claims under 28 U.S.C. § 1367(c), asking this Court not to exercise supplemental jurisdiction. The City makes the same arguments for dismissal of both Count Four and Count Five and

asserts the Court should dismiss the FERA claim because "claims under A.R.S. § 41-1493.03 a[re] novel within the meaning of § 1367(c)(1)." (Doc. 35 at 15) (internal quotations omitted).

Such an evaluation, however, depends on the facts of a case and thus is not appropriate on a motion to dismiss. As such, this Court denies Defendant's Motion to Dismiss Counts Four and Five without prejudice.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Counts One, Two, and Three are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Counts Four and Five are denied without prejudice.

Dated this 21st day of November, 2024.

_____
G. Murray Snow
Senior United States District Judge